Evan Nadel (SBN 213230)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.
44 Montgomery Street, 36th Floor
San Francisco, CA  94104
Telelphone:  415-432-6000
Facsimile:  415-432-6001
enadel@mintz.com

Michael Renaud (*pro hac vice*)
MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C.
One Financial Center
Boston, MA 02111
Telephone:  617-542-6000
Facsimile:  617-542-2241
mrenaud@mintz.com

Brad M. Scheller (*pro hac vice*)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.
666 Third Avenue
New York, NY 10017
Telephone:  212-935-3000
Facsimile:  212-983-3115
bmscheller@mintz.com

Attorneys for Defendants
INTERACTIVE DIGITAL SOLUTIONS, LLC and
MEDSITTER, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| CAREVIEW COMMUNICATIONS, INC., | No. 4:21-cv-07061-HSG |
| Plaintiff, | **INTERACTIVE DIGITAL SOLUTIONS, LLC AND MEDSITTER, LLC'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)** |
| v. | |
| INTERACTIVE DIGITAL SOLUTIONS, LLC AND MEDSITTER, LLC, | |
| Defendants. | |
| | DATE:        April 7, 2022 |
| | TIME:        2:00 p.m. |
| | PLACE:      Courtroom 2 |
| | JUDGE:      Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

Page

STATEMENT OF RELIEF REQUESTED ...................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................1

I.    INTRODUCTION ...................................................................................................1

II.   THE CAREVIEW PATENTS .................................................................................3

      A.   The '348 Patent—"Methods for Refining Patient, Staff and Visitor Profiles Used in Monitoring Quality and Performance at a Healthcare Facility" ..................................................................................................3

      B.   The '069 Patent—"Monitoring Patient Support Exiting and Initiating Response" .......................................................................................4

      C.   The '012 Patent—"Noise Correcting Patient Fall Risk State System and Method for Predicting Patient Falls" .......................................5

      D.   The '961 Patent—"Surveillance System and Method for Predicting Patient Falls Using Motion Feature Patterns" ...........................6

      E.   The '320 Patent—"Electronic Patient Sitter Management System and Method for Implementing" ..................................................7

III.  RELEVANT LEGAL PRINCIPLES ......................................................................8

      A.   The Court Can and Should Address Patent Ineligibility Now ................8

      B.   The Alice Framework for Determining Patent Ineligibility ...................9

IV.   THE CAREVIEW PATENTS ARE INVALID UNDER 35 U.S.C. § 101 ...........11

      A.   The '348 Patent Claims are Not Patent Eligible ...................................11

      B.   The '069 Patent Claims are Not Patent Eligible ...................................14

      C.   The '012 Patent Claims are Not Patent Eligible ...................................17

      D.   The '961 Patent Claims are Not Patent Eligible ...................................20

      E.   The '320 Patent Claims are Not Patent Eligible ...................................22

VI.   CONCLUSION ......................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Aatrix Software, Inc. v. Green Shades Software, Inc.,*
5
    882 F.3d 1121 (Fed. Cir. 2018)................................................................8

6

*Abhyanker v. Airbnb, Inc.,*
    No. 20-cv-08248-JST, 2021 WL 4499413 (N.D. Cal. Jul. 8, 2021)...........................8
7

8

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.,*
    838 F.3d 1266 (Fed. Cir. 2016)................................................................22

9

*Affinity Labs of Tex., LLC v. DIRECTV, LLC,*
    838 F.3d 1253 (Fed. Cir. 2016)................................................................22
10

11

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
    573 U.S. 208 (2014)................................................................*passim*

12

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016) ..........................10

13

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.,*
14
    687 F.3d 1266 (Fed. Cir. 2012) ................................................................9

15

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC,*
    827 F.3d 1341 (Fed. Cir. 2016)................................................................*passim*
16

17

*Berkheimer v. HP, Inc.,*
    881 F.3d 1360 (Fed. Cir. 2018)................................................................*passim*
18

19

*Blue Spike, LLC v. Google Inc.,*
    No. 14-cv-01650, 2015 WL 5260596 (N.D. Cal. Sept. 8, 2015)......................................15, 20

20

*Brightedge Techs., Inc. v. Searchmetrics,*
21
    304 F. Supp. 3d 859 (N.D. Cal. Jan. 19, 2018)................................................................*passim*

22

*Broadcom Corp. v. Netflix, Inc.,*
    No. 20-cv-04677, 2021 WL 4170784 (N.D. Cal. Sept. 14, 2021)..................................*passim*
23

24

*buySAFE, Inc. v. Google, Inc.,*
    765 F.3d 1350 (Fed. Cir. 2014)................................................................*passim*

25

*Collarity, Inc. v. Google Inc.,*
    2015 WL 7597413 (D. Del. Nov. 25, 2015) ................................................................13
26

27

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.,*
    776 F.3d 1343 (Fed. Cir. 2014)................................................................*passim*
28

*Coop. Entm't, Inc. v. Kollective Tech, Inc.*,
   No. 20-cv-07273, 2021 WL 2531069 (N.D. Cal. Jun. 21, 2021) ................................... *passim*

*Crandall Techs. LLC v. Vudu, Inc.*,
   No. 20-cv-04849, 2021 WL 521215 (N.D. Cal. Feb. 12, 2021) ..............................................23

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
   758 F.3d 1344 (Fed. Cir. 2014)...................................................................................... *passim*

*Elec. Power Group, LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016)...................................................................................... *passim*

*Enfish, LLC v. Microsoft Corp.*,
   882 F.3d 1327 (Fed. Cir. 2016)...................................................................................................9

*Ericsson, Inc. v. TLC Commc'n Tech. Holdings, Ltd.*, 955 F.3d 1317, 1327 (Fed.
   Cir. 2020) ...............................................................................................................................11

*Esoterix Genetic Labs., LLC v. Qiagen NV*,
   No. 14-cv-13228, 2016 WL 4555613 (D. Mass. Aug. 31, 2016) ...........................................17

*Fairwarning IP, LLC v. Iatric Sys., Inc.*,
   839 F.3d 1089 (Fed. Cir. 2016).............................................................................................13

*First-Class Monitoring, LLC v. United Parcel Serv. of Am.*,
   389 F. Supp. 3d 456 (E.D.Tex. Jul. 22, 2019) .....................................................................19

*Genetic Techs. Ltd. v. Merial L.L.C.*,
   818 F.3d 1369 (Fed. Cir. 2016).................................................................................................9

*Healthtrio, LLC v. Aetna, Inc.*,
   No. 12-cv-03229, 2015 2015 WL 4005985 (D.Col. Jun. 17, 2015) ......................................13

*In re TLI Comm'ns LLC Patent Lit.*,

   823 F.3d 607 (Fed. Cir. 2016) ...................................................................................................9

*Intellectual Ventures I LLC v. Capital One Bank*,
   792 F.3d 1363 (Fed. Cir. 2015)...............................................................................................15

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
   850 F.3d 1315 (Fed. Cir. 2017)..................................................................................... *passim*

*Linquet Techs., Inc. v. Tile, Inc.*, No. 20-cv-05153, 2021 WL 4198521, at *11, 14
   (N.D. Cal. Sep. 15, 2021) ............................................................................................ *passim*

*Louis A Coffelt, Jr. v. Nvidia Corporation et al.*,
   680 Fed. App'x. 1010 (Fed. Cir. 2017) .................................................................................17

*Mayo Collaborative Servs. v. Prometheus Labs.*,
    566 U.S. 66, 72-73 (2012) ........................................................................9

*McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1314 (Fed. Cir.
    2016) .........................................................................................................10

*Parker v. Flook*,
    437 U.S. 584 (1978)..................................................................................21

*Purepredictive, Inc. v. H2O.AI, Inc.*,
    No. 17-cv-03049, 2017 WL 3721480 (N.D. Cal. Aug. 29, 2017) ................9, 10, 13

*Simio, LLC v. Flexsim Software Prods., Inc.*, 983 F.3d 1353 at 1360 (Fed. Cir.
    2020) ................................................................................... *passim*

*Smartflash LLC v. Apple Inc.*,
    680 F.App'x 977 (Fed. Cir. 2017) ..............................................................15

*Software Rights Archive, LLC v. Facebook, Inc.*,
    485 F. Supp. 3d 1096 (N.D. Cal. Sept. 9, 2020) (Gilliam, J.) ......................... *passim*

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016) .................................................................10

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017).................................................... *passim*

*Univ. of Florida Res. Found. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2019).................................................... *passim*

*Versata Dev. Group, Inc. v. SAP Am., Inc.*,
    793 F.3d 1306 (Fed. Cir. 2015)..................................................................22

**Statutes**

35 U.S.C. § 101 ............................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...........................................................................1, 7

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on April 7, 2022, at 2:00 PM, or as soon thereafter as this matter can be heard, in Courtroom 2 of this Court, located at 1301 Clay Street, Oakland, California, 94612, Defendants Interactive Digital Solutions, LLC and MedSitter, LLC will and hereby do move to dismiss Plaintiff CareView Communications, Inc.'s Second Amended Complaint ("SAC") (Dkt. No. 58) under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted because all claims of the asserted patents – U.S. Patent Nos. 7,911,348 ("the '348 Patent"), 7,987,069 ("the '069 Patent"), 9,318,012 ("the '012 Patent"), 10,055,961 ("the '961 Patent") and 9,635,320 ("the '320 Patent") (collectively, the "CareView Patents") – are invalid as claiming patent-ineligible subject matter under 35 U.S.C. § 101. This motion is based on this Notice of Motion, the Declaration of Brad M. Scheller ("Scheller Decl.") and its respective exhibits, the below Memorandum of Points and Authorities, the pleadings in the case and any evidence and arguments presented at the hearing.

**STATEMENT OF RELIEF REQUESTED**

Defendants request the Court grant the Motion and dismiss the SAC with prejudice.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

> "*The claims asserted here are directed to precisely what the Federal Circuit has held to be an abstract idea.... They ... provide general detail about collecting and analyzing .... information on conventional computers [and] fit squarely within the 'line of precedent that ... classifies data collection, organization, and analysis as abstract—even where that produces new data—in the absence of a claimed technological improvement.*"
>
> –Judge Gilliam, *Software Rights Archive, LLC v. Facebook, Inc.*, 485 F. Supp. 3d 1096, 1105 (N.D. Cal. Sept. 9, 2020)

\*          \*          \*

These words apply with equal force here. Though unrelated, the five CareView Patents are directed to the abstract idea of collecting, organizing and analyzing patient data using conventional computing and sensing technologies:

➢ The **'348 Patent** is directed to automating the human activity of managing and updating patient health records and uses functional claim language like "storing," "receiving and "refining";

➢ The **'069 Patent** is directed to the abstract idea of comparing real-time and stored data and analyzing that data with mathematical algorithms and also uses functional claim terms like "accessing," "generating," "comparing," "determining," "detecting" and "combining";

➢ The **'012 Patent** is directed to the abstract idea of receiving and processing video data and recites steps of "receiving," "detecting," "evaluating" and "identifying";

➢ The **'961 Patent** is directed to the abstract idea of extracting and comparing data to stored data and similarly uses claim language like "storing," "receiving," "determining" and "comparing"; and

➢ The **'320 Patent** is directed to the abstract idea of transmitting data among computing devices and also uses functional claim terms like "identifying," "receiving," "transmitting" and "providing".

No claim in any CareView Patent details how the recited results are achieved or establishes that any specific technology is required. Nor does any claim recite an inventive concept to move its abstract idea into the realm of patent-eligible subject matter—each one uses generic components ordered in a conventional way. The specification in fact encourages using known technologies to implement the claimed ideas.

This Court and the Federal Circuit routinely determine that claims like those in the CareView Patents are invalid under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) and dismiss cases accordingly. Defendants request dismissal here consistent with these decisions.

## II.     THE CAREVIEW PATENTS

### A.     The '348 Patent—"Methods for Refining Patient, Staff and Visitor Profiles Used in Monitoring Quality and Performance at a Healthcare Facility"

The '348 Patent seeks to reduce "the incidence of false positives and false negatives" from "a 'one size fits all' approach to detecting and interpreting patient movements." Ex. A,[1] '348 Patent, 2:61-67. The patent explains that, while "people have uniquely personal ways of getting out of bed, no attempt is made in conventional monitoring systems to understand the specific movements … of a particular patient." *Id.*, 2:66-3:3. Thus, "it would be an advancement [to] more accurately detect and interpret individual behaviors and conditions." *Id.*, 3:13-18.

The claims recite storing an initial patient profile, receiving collected data from sensors, cameras or computers and refining profiles based on the collected data. Claim 1 is representative:

> In a **computer system** that includes a **processor**, **system memory**, and stationary **storage apparatus**, that maintains stored profiles for a plurality of patients at a facility, and that receives data from **networked computers or other devices** at the facility relating to behavior, activities, care, wellness or other information for each patient, a method for maintaining and refining the stored profiles for patients at the facility comprising:

> the computer system *storing* on the stationary storage apparatus *an initial profile for each of a plurality of patients* at a facility based on at least one of specific personalized information for each patient or general information common to more than one patient, the profile including at least one of a limit for detecting an event, an alarm level for use in detecting an actionable event, a care regimen for the patient, or a wellness parameter for the patient, wherein the profile includes both static data and dynamic data;

> the computer system *receiving collected data* related to detected events, actionable events, care regimens, and/or wellness parameters for at least some of the patients at the facility, the data being collected at least in part using **sensors, cameras and/or computers** positioned within the facility that detect and/or analyze data regarding locations and/or movements of at least some of the patients at the facility, locations and/or movements of at least some of the staff members, assets and/or visitors at the facility, physical condition of at least some of the patients, and/or activities performed on and/or by at least some of the patients; and

> the computer system *refining the profiles* for at least some of the patients at the facility *based on the collected data* in order to modify at least one of limits or alarm levels *and storing refined profiles* for at least some of the patients at the facility on the

---

[1] Unless otherwise specified, the exhibits cited in this brief are attached to the Scheller Decl.

1
2
3
4
5

stationary storage apparatus, wherein refining the profiles includes altering the
dynamic data of the refined profiles.

*Id.*, 45:12-48 (emphasis added). The claims recite a "computer system," "sensors, cameras and/or
computers," and a "stationary storage apparatus" but do not disclose any structure suggesting that
these components are anything other than generic; nor does the specification. *Id.*, 10:3-11, 20-34;
11:1-13; 11:66-12:31; 14:1-9, 30-61.

6
7

**B.      The '069 Patent—"Monitoring Patient Support Exiting and Initiating Response"**

8
9
10
11
12
13
14
15

Like the '348 Patent, the '069 Patent seeks to reduce "high levels of false positives and false
negatives" in detecting patient movement. Ex. B, '069 Patent, Abst., 2:5-10. The patent explains that,
because "continuous direct supervision" of each patient was not feasible, healthcare facilities turned
to "automated patient monitoring systems." *Id.*, 1:34-2:4. The '069 Patent seeks to improve upon
those then-existing automated systems. *Id.*, 2:32-59. The claimed methods use "sensors" to track
movement and a "computer system" to generate "a motion capture pattern summary," compare that
"summary" to stored "movement pattern data sets" indicative of an exit attempt, identify similarities
between the "summary" and "data sets" and detect an exit attempt by calculating a probability value
and comparing it to a threshold value. Claim 1 is representative:

16
17

At a **computer system**, a method for detecting a support platform exiting event, the
method comprising:

18
19

***accessing movement data from sensors*** that are monitoring a patient resting on a
support platform, the movement data indicative of movement in one or more portions
of the patient's body;

20
21

***generating a motion capture pattern summary*** for the patient from the accessed
movement data, the motion capture pattern summary capturing movements for the one
or more portions of the patient's body;

22
23

***comparing the*** motion capture pattern ***summary to*** one or more ***movement pattern
data sets in a library*** of movement pattern data sets, the one or more movement pattern
data sets in the library of movement pattern data sets being representative of
movements having some probability of indicating platform support exiting;

24
25

***determining that the*** motion capture pattern ***summary is sufficiently similar to one of
the*** one or more ***movement pattern data sets*** in the **library** of movement pattern data
sets; and

26
27

***detecting that the patient is attempting to exit*** the support platform based on the
determined similarity ***by***:

28

> ***accessing a general probability factor*** corresponding to the one or more movement pattern data sets, the general probability factor generally indicative of the probability of the detected movement corresponding to a support platform exiting event;
>
> ***accessing a behavioral weighting factor*** for the patient, the value of the behavioral weighting factor based on prior detections of movement pattern data sets confirmed as support platform exiting attempts by the patient;
>
> ***combining the probability factor and the behavioral weighting factor into a patient specific probability factor***, and
>
> ***determining that the*** patient ***specified probability factor satisfies a configured probability threshold*** indicative of a support platform exiting event.

*Id.*, 30:66-31:36 (emphasis added). The specification notes that using cameras to monitor patient movement and predict exit attempts was well-known and that the "computer system" uses algorithms and "electronic tracking systems" known in the art. *Id.*, 1:48-2:1, 7:55-59; 10:51-54. The patent also discloses that the "sensors" can be known cameras or pressure sensors. *Id.*, 4:59-5:10. The specification is silent about the structure of the "computer system," aside from disclosing that it uses software. *Id.*, 5:15-16 ("event detection module 121"); 7:55-56 ("comparison module 226").

## C.  The '012 Patent—"Noise Correcting Patient Fall Risk State System and Method for Predicting Patient Falls"

The '012 Patent seeks to improve on methods like those disclosed in the '069 Patent that compare real-time movement to known data sets. Ex. C, '012 Patent, Abst. The patent explains that in the prior art *any* change detected between video frames that completed a movement pattern matching a fall signature would produce an alert. *Id.*, 4:16-45. As a result, the prior art systems frequently issued alerts that were not indicative of a patient fall. False alerts were also triggered by "spurious noise" from "electrical components" or "light receptors." *Id.*, 4:52-65.

The '012 Patent claims address these issues by correlating movement data with one of several hierarchical "fall risk states" (low, intermediate or high risk) and, using programmed "fall risk state transition rules," identifying whether a change in data requires upgrading or downgrading the patient movement to a different "fall risk state." Claim 1 is representative:

> A method for predicting a risk of a patient fall based on a plurality of fall risk states, the plurality of fall risk states defining a hierarchy of discrete fall risk states, at least one of the fall risk states being associated with an action, the method comprising:

> ***receiving a plurality of video frames*** from a surveillance video camera, said surveillance video camera captures a sequence of video frames of a surveillance area, wherein a patient is present in the surveillance area, each of the plurality of video frames comprising a plurality of predetermined areas;
>
> ***detecting a change*** in at least one of the plurality of predetermined areas of the current video frame of the plurality of video frames,
>
> ***evaluating the change*** detected in the at least one of the plurality of predetermined areas of the current video frame for noise; and
>
> ***identifying a fall risk transition to a fall risk state*** selected from the hierarchy of discrete fall risk states, the hierarchy of discrete fall risk states including a wait state, a no-wait state, and at least one other state, and wherein each fall risk state includes event and timing information, wherein the identification of a fall risk transition is based upon the change detected in the at least one of the plurality of predetermined areas of the current video frame.

*Id.*, 35:57-36:16 (emphasis added). The method thus involves receiving video data, detecting a change in that data, evaluating the change for characteristics and, based on the evaluation, identifying a change ("transition").

While claim 1 does not associate *any* physical components with the claimed functionality, system claim 11 does recite a "video processor operative to" perform the "detecting," "evaluating" and "identifying" steps. *Id.*, 37:58-38:14. The specification describes the video processor as a "patient monitoring device 101," "self-contained, standalone device … with a display screen" or "video camera 102." *Id.*, 13:56-63. The specification also states that "video programs" identifying a patient fall," video systems "identify[ing] … [hazardous] zones [in] the patient room" and systems that "analyze[] surveillance video frames" were in the prior art. *Id.*, 3:19-4:15.

**D.      The '961 Patent—"Surveillance System and Method for Predicting Patient Falls Using Motion Feature Patterns"**

The '961 Patent also seeks to improve on the methods described in the '069 Patent. Ex. D, '961 Patent, at Abst. Similar to the '069 Patent, the '961 Patent is directed to storing motion data and determining whether real-time movement matches that stored data. Claim 11 is representative:

> A method for predicting a condition of elevated risk of a fall with a **computer system** comprising:
>
> ***storing motion feature patterns*** that are extracted from video recordings, the motion feature patterns are representative of motion associated with real alarm cases and false-alarm cases of fall events;

6

*receiving a fall alert* from a classifier, the fall alert associated with the plurality of frames generated by the surveillance camera;

*determining motion features* of one or more frames from the plurality of frames that correspond to the fall alert;

*comparing the motion features* of the one or more frames *with the motion feature patterns*; and

*determining whether to confirm the fall alert* based on the comparison.

*Id.*, 19:3-17 (emphasis added). The specification describes the "computer system" as a general-purpose computing device (*id.*, 5:34-6:45; 7:2-6) and the "classifier" as any general-purpose machine-learning algorithm, including "a decision tree … nearest neighbor, support vector machines, or neural networks." *Id.*, 12:36-38. The specification does not describe any advantages of using a particular machine-learning algorithm, any specific considerations for selecting an algorithm, or any required improvements or novel changes to an algorithm in order to perform the method. *Id.*, 12:36-38, 44-58; 14:20-63.

**E.    The '320 Patent—"Electronic Patient Sitter Management System and Method for Implementing"**

Unlike the first four patents, the '320 Patent is directed to monitoring and managing *sitters*, not patients. Ex. E, '320 Patent, Abst. The patent explains that, historically, patients were monitored (i) in groups by skilled professionals at remote stations or (ii) individually by unskilled personnel sitting in each room. *Id.*, 1:53-58. According to the '320 Patent, both options had disadvantages. Using skilled professionals was costly and resulted in unattended rooms when a professional had to leave a station to administer care. *Id.*, 2:31-57. Equally problematic was the cost of deploying an individual sitter into each patient room. *Id.*, 3:18-33.

The '320 Patent claims are thus directed to having *one* sitter manage *multiple* patients. *Id.*, 3:37-4:21; 9:55-60; 12:44-50. Claim 1 is representative:

A method for managing an electronic sitter system for monitoring patients, the electronic sitter system comprising a plurality of **sitter devices**, a **sitter management device** for managing access to at least one real-time patient surveillance video stream associated with a patient room, and a plurality of **cameras** located in patient rooms for capturing and transmitting surveillance video streams to the sitter management device the method comprising:

DEFENDANTS' MOTION TO DISMISS
NO. 4:21-CV-07061-HSG

the sitter management device *identifying a* first real-time patient surveillance *video stream* it received from a first patient room *to transmit* to a first sitter device selected from a plurality of sitter devices;

*receiving*, at the first sitter device, *the* real-time patient surveillance *video stream* from the sitter management device *and displaying the* first real-time patient surveillance *video stream* at the first sitter device, wherein the first sitter device receives the first real-time patient surveillance video stream regardless of whether an alert is received by the first sitter device;

*transmitting motion sensor data* from the first patient room to the sitter management device;

*receiving the alert* at the first sitter device from the sitter management device, wherein the alert is triggered by motion in a patient room and wherein the alert is received subsequent to the first sitter device receiving the real-time patient surveillance video stream;

*providing at least one interactive control* for responding to the received alert, the interactive control operative to allow the sitter device to control the operation of the sitter management device or enable communication between the sitter device and the patient room; and

*logging the alert* to an event log at the sitter management device.

*Id.*, 39:51-40:17 (emphasis added). The claims recite transmitting video and alert data associated with a patient room from a management device to a sitter device and allowing the sitter device to control the management device or communicate with the patient. The "sitter device" can be a "mobile computing device [with a] touchscreen 302, webcam and various buttons and user controls," such as an "iPad … ExoPC Slate … HP Slate" or some other "mobile computer, net device, or smart phone". *Id.*, 16:43-17:15. The "sitter management device" structure is not described. *Id.*, 10:54-60; 16:31-34.

## III.   RELEVANT LEGAL PRINCIPLES

### A.   The Court Can and Should Address Patent Eligibility Now

Patent ineligibility can be addressed at the Rule 12(b)(6) stage when no factual allegations taken as true prevent this determination. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *see also Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (stating patent ineligibility is a legal question); *Abhyanker v. Airbnb, Inc.*, No. 20-cv-08248, 2021 WL 4499413, at *3 (N.D. Cal. Jul. 8, 2021) ("[Existing fact disputes] does not mean that patent eligibility cannot be decided on a motion to dismiss."). Patents can be challenged at the pleading stage when it is clear from the complaint, patent disclosures and materials subject to judicial notice that the

claims are not patent-eligible. *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1371 (Fed. Cir. 2016). "In such circumstances where it is possible and proper, 'claim construction is not an inviolable prerequisite to a validity determination under § 101.'" *Purepredictive, Inc. v. H2O.AI, Inc.*, No. 17-cv-03049, 2017 WL 3721480, at *2 (N.D. Cal. Aug. 29, 2017) (quoting *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012)).

### B.    The *Alice* Framework for Determining Patent Eligibility

The Supreme Court and Federal Circuit have articulated a two-part test for determining patent eligibility. A court must first determine whether a claim is "directed to" an abstract idea. *Alice,* 573 U.S. 208 at 217-18; *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1346-47 (Fed. Cir. 2014). If it is, the court must then consider the claim elements individually and as an ordered combination to assess whether any elements transform the abstract idea into a patent-eligible application. *Content Extraction,* 776 F.3d 1343 at 1347. "This is the search for an 'inventive concept'—something sufficient to ensure that the claim amounts to 'significantly more' than the abstract idea itself." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs.,* 566 U.S. 66, 72-73 (2012)); *see also Alice,* 573 U.S. 208 at 217-18.

In "*Enfish, LLC v. Microsoft Corp.*, the Federal Circuit found it 'relevant to ask whether the claims are directed to an improvement in computer functionality versus being directed to an abstract idea.'" *Software Rights*, 485 F. Supp. 3d at 1102 (citing *Enfish, LLC v. Microsoft Corp.*, 882 F.3d 1327, 1335 (Fed. Cir. 2016)). The "key question" is whether the claims are focused on improvements in computer capabilities or on an abstract process that uses computers merely as a tool. *Id.* at 1102; *see also Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1325 (Fed. Cir. 2017). The Federal Circuit has also explained that claims are abstract if directed to using conventional technology in "a nascent but well-known environment." *Id.* at 1103 (quoting *In re TLI Comm'ns LLC Patent Lit.*, 823 F.3d 607, 612 (Fed. Cir. 2016)). Claims "that describe 'a new telephone, a new server, or a new physical combination of the two' are not abstract, but claims that describe a system and methods in 'purely functional terms' without 'any technical details for the tangible components' are abstract." *Id.* at 1103. The key inquiry is "whether the claims … focus on a specific means or method that

1   improves the relevant technology or are instead directed to a result or effect that itself is the abstract

2   idea and merely invoke generic processes and machinery." *Id.* (quoting *McRO, Inc. v. Bandai Namco*

3   *Games Am., Inc.,* 837 F.3d 1299, 1314 (Fed. Cir. 2016)). The focus must be on the claim language—

4   "complex details from the specification cannot save a claim directed to an abstract idea that recites

5   generic computer parts." *Id.* (quoting *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149

6   (Fed. Cir. 2016)).

7           Courts should also look to prior cases having similar patent claims and how they were decided.

8   *Id.* (quoting *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016)).

9   This Court and others have evaluated and held invalid patent claims similar to those in the CareView

10  Patents. For example, in *Software Rights*, this Court considered claimed methods reciting "choosing

11  a node" and "accessing," "identifying," "determining" and "displaying" data and classified the claims

12  as directed to the abstract idea of collecting, organizing and analyzing data with no reference to any

13  technological improvement. 485 F. Supp. 3d at 1104-05. The claims also failed *Alice* step two because

14  no recited elements made the claims "significantly more" than the overall ineligible concept. *Id.* at

15  1112.

16          Similarly, in *Brightedge Techs., Inc. v. Searchmetrics*, this Court found claimed methods

17  reciting "determining" and "correlating shares of voice" and "displaying the relative change in shares

18  of voice" as being directed to the abstract idea of collecting, organizing and analyzing data. 304 F.

19  Supp. 3d 859, 865-67 (N.D. Cal. Jan. 19, 2018) (Gilliam, J.). The claims merely "set forth a

20  conventional process for collecting and analyzing [that data] via a mathematical process" and thus

21  also failed *Alice* step two. *Id.* at 872.

22          In *Linquet Techs., Inc. v. Tile, Inc.*, Judge Donato found claims reciting "detect[ing] one or

23  more signals," "determin[ing] a status" and "transmit[ting] [a] position" as using purely functional

24  language to recite the abstract idea of tracking and locating an object "without any implication that

25  the invention solves a problem specific to computers." No. 20-cv-05153, 2021 WL 4198521, at *11,

26  14 (N.D. Cal. Setp. 15, 2021). The claims also lacked an inventive concept—"Claim 1 uses

27

28

1  conventional elements and components that are ordered in a conventional way, without adding

2  anything inventive." *Id*. at *16.

3      Lastly, this Court has even considered claims directed to predictive analysis. For example, in

4  *Purepredictive, Inc. v. H2O.AI, Inc.*, the Court found the claims "directed to a mental process and the

5  abstract concept of using mathematical algorithms to perform predictive analytics." 2017 WL

6  3721480, at *1, 13. The claims also failed *Alice* step two—"PPI's solutions remain the abstract

7  mathematical processes of collecting and analyzing data … not [an] unconventional or inventive

8  solution." *Id*. at *19-20.

9  **IV.    THE CAREVIEW PATENTS ARE INVALID UNDER 35 U.S.C. § 101**

10      **A.    The '348 Patent Claims are Not Patent Eligible**

11          **1.    The Claims are Directed to the Abstract Idea of Collecting, Analyzing and
                    Revising Data**

12      The '348 Patent fails *Alice* step one. The claims are directed to updating patient records with

13  new information – an activity long performed by humans. *Broadcom Corp. v. Netflix, Inc.*, No. 20-

14  cv-04677, 2021 WL 4170784, at *6 (N.D. Cal. Sept. 14, 2021) ("Processes are directed to an abstract

15  idea where they are 'the sort of process than 'can be performed in the human mind, or by a human

16  using a pen and paper.'") (quoting *Ericsson, Inc. v. TLC Commc'n Tech. Holdings, Ltd.*, 955 F.3d

17  1317, 1327 (Fed. Cir. 2020)).

18      By their plain language, the claims are specifically drawn to the abstract idea of collecting,

19  analyzing and revising data. Independent claims 1, 27, 28 and 31 all recite steps to store patient

20  profiles and refine those profiles using new data. These types of activities – data storage, collection

21  and analysis – constitute "longstanding conduct that existed well before the advent of computers."

22  *Brightedge*, 304 F. Supp. 3d at 866; *see also Intellectual Ventures I*, 850 F.3d at 1326-27 (finding

23  methods reciting index-searchable database abstract); *BASCOM Glob. Internet Servs., Inc. v. AT&T*

24  *Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) (finding filtering system for Internet content

25  abstract); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir.

26  2014) (finding process generating device profile abstract because it "describe[d] a process of

27  organizing information through mathematical correlations and is not tied to a specific structure or

28

machine"). Moreover, "limiting the invention to a specific type of information" – patient-related data – "does not make 'an abstract concept any less abstract under step one.'" *Software Rights*, 485 F. Supp. 3d at 1108 (citing *Intellectual Ventures I*, 850 F.3d at 1342).

The '348 Patent provides no new physical or technical improvement. The claims describe generic computer functionality using "purely functional terms," such as "storing" profiles, "receiving collected data" and "refining the profiles," without reciting with any particularity *how* the computer system performs these tasks. *Broadcom*, 2021 WL 4170784, at *6. These functional terms underscore the abstract nature of the claims, as results-based language coupled with conventional technology is generally abstract. *Coop. Entm't, Inc. v. Kollective Tech, Inc.,* No. 20-cv-07273, 2021 WL 2531069, at *5 (N.D. Cal. Jun. 21, 2021) (citing *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017)). Implementing an abstract concept on a generic "computer system" with "a processor," "system memory" and "stationary storage apparatus," as the '348 Patent contemplates, does not make it non-abstract. *Linquet*, 2021 WL 4198521, at *4.

The specification confirms the abstract nature of the claims. The patent explains that the recited generic computing components merely automate steps historically performed by humans. Ex. A, '348 Patent, 1:40-48. The benefits discussed in the specification of using computers are the product of "financial and/or logistical restraints" and a "shortage of … caregivers," not the inability of humans to update health records without a computer. *Id.*, 2:7-19, 32-46. It is thus not surprising that the specification describes no new tangible components and no technological solution to a technological problem; instead, the "computer system" is merely a conduit for the abstract idea of collecting and analyzing data to update patient records. *See Univ. of Florida Res. Found. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019). "Implementing an old practice in a new environment does not convert an otherwise abstract idea into something patentable." *Broadcom*, 2021 WL 4170784, at *7 (citing *Simio, LLC v. Flexsim Software Prods., Inc.*, 983 F.3d 1353, 1360 (Fed. Cir. 2020)). The '348 Patent in fact emphasizes that "general-purpose" computers, hardware, storage media and data structures are used to carry out the claimed methods. Ex. A, '348 Patent, 10:1-11:13.

The '348 Patent claims "fit squarely within the 'line of precedent that classifies data collection and analysis as abstract—even where that produces new data—in the absence of a claimed technological improvement.'" *Software Rights*, 485 F. Supp. 3d at 1105 (finding claims for collecting, analyzing and displaying information abstract); *see also Fairwarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093-94 (Fed. Cir. 2016) (finding claims directed to "collecting information" and "analyzing information by steps people go through in their minds" abstract); *Elec. Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (finding claims directed to "collecting information, analyzing it, and displaying certain results of the collection and analysis" abstract); *Content Extraction*, 776 F.3d at 1349 (finding claims directed to "extracting data," "recognizing specific information from the extracted data" and "storing that information" abstract); *Brightedge*, 304 F. Supp. 3d at 867 (finding claims directed to "improving market performance via data aggregation and analysis" abstract); *Linquet*, 2021 WL 4198521, at *4 (finding claims directed to tracking and locating an object abstract); *Purepredictive*, 2017 WL 3721480, at *5 (finding claims directed to "using mathematical algorithms to perform predictive analytics" abstract); *Healthtrio, LLC v. Aetna, Inc.*, No. 12-cv-03229, 2015 WL 4005985, at *3-4 (D. Col. Jun. 17, 2015) (finding collecting health information from multiple sources and compiling into single record abstract); *Collarity, Inc. v. Google Inc.*, 2015 WL 7597413, at *4-8 (D. Del. Nov. 25, 2015) (finding methods of generating, refining and suggesting keywords abstract).

The dependent claims of the '348 Patent do not save the day. While these claims provide additional methods for data collection, analysis and revision, none transform the otherwise abstract processes in independent claims 1, 27, 28 and 31 into patent-eligible subject matter. *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("The dependent claims narrowing of such long-familiar commercial transactions does not make the idea non-abstract for section 101 purposes.").

### 2.    The Claims Lack an Inventive Concept

The claim elements, whether individually or as an ordered combination, do not transform the abstract process in independent claims 1, 27, 28 and 31 into patent-eligible subject matter. The claims recite conventional components ordered in a conventional way for collecting, analyzing and revising data. The claimed steps of "storing," "receiving" and "refining," and more specifically the claimed

13

process of monitoring patients, collecting patient data (e.g., using sensors or computing devices) and refining patient profiles, are well-known, routine, and conventional steps for processing data on a computer. *Elec. Power Grp.*, 830 F.3d at 1356 (finding no inventive concept where claims "specif[ied] what information ... is desirable to gather, analyze, and display ... but [did] not include any requirement for performing the claimed functions … by use of anything but entirely conventional, generic technology"); *see also Two-Way Media*, 874 F.3d at 1338 ("Merely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention.").

Nor does anything in the specification suggest that these steps are performed in a non-conventional order. When "the claimed method 'use[s] a conventional ordering of steps—first processing the data, then routing it, controlling it, and monitoring its reception—with conventional technology to achieve its desired result," the claim is not patent-eligible. *See Two Way*, 874 F.3d at 1339. The patent fails to disclose or claim any "new techniques for analyzing" data or indicate that the claimed methods improve the process of collecting, analyzing and modifying user profiles. Narrowing the claims with references to specific generic devices ("sensors, cameras and/or computers") and specific data types ("a limit," "an alarm level," "a care regimen" or "a wellness parameter") does not "amount to adding 'significantly more' to the overall ineligible concept of information collection and analysis to which the claims are directed." *Software Rights*, 485 F. Supp. 3d at 1112. Nor does any dependent claim sufficiently cabin the scope of the abstract concepts recited in independent claims 1, 27, 28 and 31.

**B.      The '069 Patent Claims are Not Patent Eligible**

**1.      The Claims are Directed to the Abstract Idea of Collecting and Analyzing Data**

The '069 Patent also fails *Alice* step one. The claims are directed to comparing real-time and stored data and calculating and comparing probability values based on that data – conventional activities long performed by humans. *Broadcom*, 2021 WL 4170784, at *6.

By their plain language, the claims are specifically drawn to the abstract idea of collecting and analyzing data. Independent claims 1, 16, 19 and 29 all recite steps to access data, generate a summary

1    of that data, compare that data to stored data and mathematically calculate a probability. These types

2    of activities – data collecting, generating, comparing and calculating – constitute "longstanding

3    conduct that existed well before the advent of computers." *Brightedge*, 304 F. Supp. 3d at 866.

4    Limiting the invention to specific information, such as patient data, does not make an abstract concept

5    any less abstract. *Software Rights*, 485 F. Supp. 3d at 1108 (citing *Intellectual Ventures I*, 850 F.3d

6    at 1342).

7        Nor does the '069 Patent describe any new technological improvement. The claims describe

8    generic computer functionality using terms like "accessing," "generating," "comparing," "detecting,"

9    "combining" and "determining," without reciting *how* the computer system actually performs these

10   tasks. *Broadcom*, 2021 WL 4170784, at *6. For example, claim 1 recites "generating a motion capture

11   pattern summary," but does not disclose how the summary is generated from the movement data or

12   the structure of the summary. Claim 1 also discloses "comparing" the summary to a library of

13   movement pattern data sets, but does not disclose how the data is compared. Claim 1 also does not

14   disclose how the "computer system" determines that a summary is "sufficiently similar" to a

15   movement pattern data set or how the "probability factor" and "weighting factor" are combined. As

16   a whole, the claims disclose *what* steps the computer system can perform but not *how* the system

17   performs them. This results-based, functional nature of the claim language, coupled with conventional

18   technology, demonstrates exactly why the claims are abstract. *Coop. Entm't*, 2021 WL 2531069, at

19   *5; *see also Smartflash LLC v. Apple Inc.,* 680 F.App'x 977, 984 (Fed. Cir. 2017) (finding accessing

20   data abstract); *Digitech*, 758 F.3d at 1351 (finding combining values to generate a new value abstract);

21   *Intellectual Ventures I LLC v. Capital One Bank,* 792 F.3d 1363, 1367 (Fed. Cir. 2015) (finding

22   determining if value exceeds threshold abstract); *Berkheimer,* 881 F.3d at 1366 (finding comparing

23   perceived data to stored data abstract); *Blue Spike, LLC v. Google Inc.*, No. 14-cv-01650, 2015 WL

24   5260596, at *5-6 (N.D. Cal. Sept. 8, 2015) (finding determining similarities between data sets

25   abstract). Implementing these abstract concepts on a generic "computer system," "computer program

26   product," "computer-readable medium" or "processor" does not make the claims non-abstract.

27   *Linquet*, 2021 WL 4198521, at *4.

28

1   The specification reinforces the abstract nature of the claims by describing the components as

2   well-known and generic. Ex. B, '069 Patent, 4:59-5:38; 26:5-29; 29:19-30:55. The patent also

3   emphasizes that the claimed methods automate human monitoring activities to alleviate the need for

4   "round the clock supervision of every patient" using generic computers and other known devices. *Id*.,

5   1:34-49. The specification describes no new tangible components and no technological solution to a

6   technological problem. *Univ. of Florida*, 916 F.3d at 1367. The "computer system," "computer-

7   readable medium" and "processor" are mere conduits for the abstract idea of collecting and analyzing

8   data. Implementing old practices in a new environment does not convert an otherwise abstract idea

9   into something patentable. *Broadcom*, 2021 WL 4170784, at *7 (citing *Simio LLC*, 983 F.3d at 1360).

10   The '069 Patent claims, like those in the '348 Patent, "fit squarely within the 'line of precedent

11   that classifies data collection and analysis as abstract—even where that produces new data—in the

12   absence of a claimed technological improvement." *Software Rights*, 485 F. Supp. 3d at 1108; *see also*

13   *supra* Section IV.A.1 (citing cases).

14   The dependent claims also do not change the analysis. While these claims provide additional

15   methods for data collection and analysis, none transform the otherwise abstract processes recited in

16   independent claims 1, 16, 19 and 29 into patentable subject matter. *buySAFE*, 765 F.3d at 1355

17   (finding dependent claims narrowing known transactions does not make abstract idea non-abstract).

18   Lastly, while independent claim 29, and depending claims 13, 14 and 30, of the '069 Patent

19   recite various structural elements of a "bed," these recitations do not transform their abstract nature.

20   Each claim recites the abstract process of comparing real-time and stored data and analyzing that data

21   with mathematical algorithms and uses functional claim language to do so, and nothing in the patent

22   indicates that the "bed" is any other than a known configuration for use with the claimed method.

### 2.    The Claims Lack an Inventive Concept

23   The claim elements, whether individually or as an ordered combination, do not transform the

24   abstract process in independent claims 1, 16, 19 and 29 into patent-eligible subject matter. The claims

25   recite conventional components ordered in a conventional way for collecting and analyzing data. The

26   steps of accessing data, generating a summary of that data, comparing that data to stored data and

27   mathematically calculating a probability value to detect if a patient is exiting his bed were previously

28

16

known, routine, and conventional steps in automated patient monitoring. Ex. B, '069 Patent, 1:48-2:1; *Elec. Power Grp.* 830 F.3d at 1356.

The narrowing concepts of "generating a motion capture pattern summary," comparing that summary to movement pattern data sets and mathematically applying "factor[s]" to the data to determine a probability value (Ex. B, '069 Patent, 15:50-16:6) are not sufficient to transform the claimed abstract idea into patent-eligible subject matter. Collecting data is an abstract concept (*Content Extraction*, 776 F.3d at 1347), as is comparing data (*Berkheimer,* 881 F.3d at 1366) and determining a probability value using mathematical calculations on a computer. *Esoterix Genetic Labs., LLC v. Qiagen NV*, No. 14-cv-13228, 2016 WL 4555613, at *7-8 (D. Mass. Aug. 31, 2016).

Narrowing the claims with references to specific generic devices ("computer system," "computer program product," "computer-readable medium" and/or "processor") used to perform the method does not "amount to 'significantly more' than the overall ineligible concept of information collection and analysis to which the claims are directed." *Software Rights*, 485 F. Supp. 3d at 1112. Nor does anything in the specification suggest that these steps are performed in a non-conventional order. Lastly, no element in any dependent claim is sufficient to transform the abstract methods recited in independent claims 1, 16, 19 and 29 into patent-eligible subject matter.

**C.     The '012 Patent Claims are Patent Ineligible**

**1.     The Claims are Directed to the Abstract Idea of Collecting and Analyzing Data**

Like the prior two patents, the '012 Patent also fails *Alice* step one. The claims are directed to analyzing video data and identifying results of the analysis – an activity, yet again, long performed by humans. *Broadcom*, 2021 WL 4170784, at *6; *see also Louis A Coffelt, Jr. v. Nvidia Corp.*, 680 Fed. App'x. 1010, 1011 (Fed. Cir. 2017) ("[A]nalyzing information by steps people [can] go through in their minds, or by mathematical algorithms, without more [are abstract] mental processes.")

By their plain language, the claims are specifically drawn to the abstract idea of collecting and analyzing data and identifying a change resulting from that analysis. Independent claims 1 and 11 both recite steps of "receiving"/"captur[ing]" video data, "detecting" changes in the data, "evaluating" those changes and "identify[ing]" a change ("transition") based on the "detecting" and "evaluating".

1   Ex. C, '012 Patent, 35:57-36:16; 37:58-38:14. Data collection, analysis and identification are

2   longstanding activities existing well before the advent of computers. *Brightedge*, 304 F. Supp. 3d at

3   866. Limiting the invention to specific information (patient data) also does not make 'an abstract

4   concept any less abstract. *Software Rights*, 485 F. Supp. 3d at 1108 (citing *Intellectual Ventures I*,

5   850 F.3d at 1342).

6            The '012 Patent does not disclose any new technological improvements either. The claims

7   describe generic computer functionality using "purely functional terms," such as "receiving" data,

8   "detecting" changes in data, "evaluating" the changes and "identifying" a "transition," without

9   reciting with any particularity *how* the tasks are performed. *Broadcom*, 2021 WL 4170784, at *6.

10   These claims terms underscore their abstract nature, as results-based functional language coupled

11   with conventional technology is generally abstract. *Coop. Entm't*, 2021 WL 2531069, *5. Nor does

12   implementing the abstract concept on a generic "surveillance video camera" and a "video processor"

13   with no further technological explanation make it non-abstract. *Linquet*, 2021 WL 4198521, at *4.

14   Claim 1 recites *no* physical components that perform the claimed steps, while claim 11 does not

15   disclose *how* the video processor detects a change, evaluates the change "for noise" or identifies a

16   "transition".

17            The specification does not rescue the claims from the realm of the abstract. The '012 Patent

18   explains that "alternatives" to "[around] the clock patient monitoring by a staff nurse" to minimize

19   fall risk were desired, not to improve existing technology, but rather to avoid the costs of paying staff.

20   Ex. C, '012 Patent, 2:2-24. This explains precisely why the claims recite no technological

21   improvements to any existing technology. *Univ. of Florida*, 916 F.3d at 1367. At best, claim 11

22   discloses video processor-implementations of longstanding human activity to conserve financial and

23   personnel resources. "Implementing an old practice in a new environment does not convert an

24   otherwise abstract idea into something patentable." *Broadcom*, 2021 WL 4170784, at *7 (citing

25   *Simio*, 983 F.3d at 1360).

26            The '012 Patent claims, like those in the '348 and '069 Patents, "fit squarely within the 'line

27   of precedent that classifies data collection and analysis as abstract—even where that produces new

28

1    data—in the absence of a claimed technological improvement." *Software Rights*, 485 F. Supp. 3d at

2    1108; *see also supra* Section IV.A.1 (citing cases).

3         Dependent claims 2-10 and 12-20 also recite purely functional language without reciting *how*

4    these functions are performed or identifying any technological improvements sufficient to make the

5    processes recited therein non-abstract. *buySAFE*, 765 F.3d at 1355 ("The dependent claims narrowing

6    of such long-familiar commercial transactions does not make the idea non-abstract for section 101

7    purposes.").

8              **2.      The Claims Lack an Inventive Concept**

9         The claim elements, whether individually or as an ordered combination, do not transform the

10   abstract process recited in independent claims 1 and 11 into patent-eligible subject matter. Neither

11   claim recites novel technical components. Claim 11 recites a conventional video processor. Claim 1

12   does not associate any physical components with the functional steps. Further, there is nothing

13   unconventional about the order of the "receiving," "detecting," "evaluating" and "identifying" steps

14   recited in the claims. As noted in the specification, the general process of receiving a video feed,

15   analyzing that feed for "changes" (i.e., patient movement) and determining that a patient's risk of

16   falling has changed (*e.g.*, Ex. B, '069 Patent, 3:19-4:39) are known, routine and conventional steps

17   for monitoring patients for fall risk. *See Elec. Power Grp.* 830 F.3d at 1356.

18        Even the claims' recitation of evaluating changes "for noise" remains in the abstract and

19   without any technological description. The claims provide no specific process for detecting "noise"

20   and identify no technological improvements to the "video processor" for detecting noise. A generic

21   process of detecting noise in a video frame, without describing any particular technology or

22   unconventional processes for detecting that noise, is insufficient to transform an abstract idea of image

23   processing into patent-eligible subject matter. *See First-Class Monitoring, LLC v. United Parcel Serv.*

24   *of Am.*, 389 F. Supp. 3d 456, 466 (E.D.Tex. Jul. 22, 2019) ("The claims … look to the use of known

25   technology to communicate information of a type that … has not previously been transmitted using

26   that technology. Thus, the claims are directed to 'a result or effect that … merely invoke[s] generic

27   processes and machinery.'").

28

**D.    The '961 Patent Claims are Not Patent Eligible**

**1.    The Claims are Directed to Collecting and Analyzing Data**

The '961 Patent also recites an abstract idea and thus fails *Alice* step one. The claims are directed to comparing real-time and stored data and drawing conclusions therefrom – yet again conventional human activities. *Broadcom*, 2021 WL 4170784, at *6; *Berkheimer,* 881 F.3d at 1366; *Blue Spike*, 2015 WL 5260596, at *5-6.

The claims are specifically drawn to the abstract idea of storing, collecting, analyzing, comparing and drawings conclusions about data. Independent claims 1 and 11 recite steps to store data ("motion feature patterns"), receive data (an "alert associated with [video] frames"), analyze data ("determine motion features"), compare data and draw conclusions ("determining [a] fall alert"). Ex. D, '961 Patent, 19:3-17. Storing, collecting, analyzing and comparing data and determining a result constitute "longstanding conduct that existed well before the advent of computers." *Brightedge*, 304 F. Supp. 3d at 866. Moreover, limiting the invention to specific patient data does not make the abstract concept any less abstract. *Software Rights*, 485 F. Supp. 3d at 1108 (citing *Intellectual Ventures I*, 850 F.3d at 1342).

The '961 Patent also describes no new physical or technical improvement. The claims recite generic computer functionality using "purely functional terms," such as "storing," "receiving," "determining" and "comparing," without reciting *how* the computer system performs those tasks. *Broadcom*, 2021 WL 4170784, at *6. For example, the claims do not disclose how the "motion features" are "determine[d]" from the frames, how these "motion features" are "compare[d]" with the "motion feature patterns" or how it is "determine[d]" that a fall alert be confirmed. As a whole, the claims disclose *what* steps the "computer system" can perform but not *how* the system performs them. This results-based, functional nature of the claim language, coupled with conventional technology, demonstrates exactly why the claims are abstract. *Coop. Entm't*, 2021 WL 2531069, *5; *see also Berkheimer,* 881 F.3d at 1366 (finding comparing perceived data to stored data sets abstract); *Blue Spike*, 2015 WL 5260596, at *5-6 (finding determining similarities between sets of data abstract). And implementing these abstract concepts on a generic "computer system" does not make them non-

1   abstract. *Linquet*, 2021 WL 4198521, at *4.

2        The specification only describes the components as well-known and generic. Ex. D, '961

3   Patent, 5:34-6:45, 12:44-58, 17:13-53. Like the '012 Patent, the '961 Patent explains that

4   "alternatives" to "[r]ound the clock patient monitoring by a staff nurse" to minimize fall risk were

5   desired, not to improve existing technology, but rather to avoid the costs of paying staff. *Id.*, 2:12-23.

6   This explains precisely why the claims recite no technological improvements to any existing

7   technology. *Univ. of Florida*, 916 F.3d at 1367. The specification also describes no new tangible

8   components and no technological solution to a technological problem. The "surveillance camera" and

9   "computer system comprising memory and logic circuitry" in claim 1 are mere conduits for the

10  abstract idea of collecting and analyzing data. Implementing old practices in a new environment does

11  not convert an otherwise abstract idea into something patent-eligible. *Broadcom*, 2021 WL 4170784,

12  at *7 (citing *Simio LLC*, 983 F.3d at 1360).

13       The '961 Patent claims, like those in the '348, '069 and '012 Patents, thus also "fit squarely

14  within the 'line of precedent that classifies data collection and analysis as abstract—even where that

15  produces new data—in the absence of a claimed technological improvement." *Software Rights*, 485

16  F. Supp. 3d at 1108; *see also supra* Section IV.A.1 (citing cases).

17       The dependent claims do not change the result. Like claims 1 and 11 from which they depend,

18  claims 2-10 and 12-20 recite purely functional language without reciting *how* these functions are

19  performed or identifying any technological improvements sufficient to make the processes recited

20  therein non-abstract. *buySAFE*, 765 F.3d at 1355 ("The dependent claims narrowing of such long-

21  familiar commercial transactions does not make the idea non-abstract for section 101 purposes.").

22            **2.     The Claims Lack an Inventive Concept**

23       The claim elements, whether individually or as an ordered combination, do not transform the

24  abstract process in independent claims 1 and 11 into patent-eligible subject matter. The claims recite

25  conventional operations on conventional components ordered in a conventional way. The steps of

26  storing data, receiving data, analyzing data, comparing data and determining a conclusion were

27

28

1    known, routine and conventional steps in automated patient monitoring. Ex. D, '961 Patent, 4, 2:24-

2    40; *Elec. Power Grp.* 830 F.3d at 1356.

3        The concept of "a classifier" as recited in the claims is not sufficiently inventive to transform

4    an abstract idea of analyzing and comparing data and determining a conclusion, into patent-eligible

5    subject matter. The specification discloses no modifications to, or inventive implementations of, any

6    classifier algorithms. While the specification discloses an exemplary decision tree that can be used as

7    a classifier, it fails to disclose any process of modifying how the decision tree is traversed or processed

8    so as to accommodate its use in the healthcare field, or how any portion of the previous process of

9    analyzing images must be modified to accommodate the use of a classifier. Ex. D, '961 Patent, FIG.

10   7, 12:62-63, 14:20-63. Merely stating that a well-known algorithm can be applied to a particular field

11   is insufficient to transform an abstract process into a patent-eligible process. *Versata Dev. Group, Inc.*

12   *v. SAP Am., Inc.,* 793 F.3d 1306, 1332 (Fed. Cir. 2015); *Parker v. Flook*, 437 U.S. 584, 593 (1978).

13       Narrowing the claims with references to specific generic devices ("surveillance system,"

14   "surveillance camera" and/or "computer system") used to perform the method also does not "amount

15   to 'significantly more' than the overall ineligible concept of the analyzing and comparing data and

16   determining a conclusion. *Software Rights*, 485 F. Supp. 3d at 1112. Nor does anything in the

17   specification suggest that these steps are performed in a non-conventional order. Lastly, no dependent

18   claim cabins the scope of the abstract methods in independent claims 1 and 11.

19       **E.    The '320 Patent Claims are Not Patent Eligible**

20           **1.    The Claims are Directed to the Abstract Idea of Transmitting, Displaying
                    and Storing Data**

21       Like the first four CareView Patents, the '320 Patent does not satisfy *Alice* step one. The

22   claims are directed to the "longstanding" concept of transmitting and displaying information – another

23   activity long performed by humans. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC,* 838 F.3d 1253,

24   1258 (Fed. Cir. 2016); *Affinity Labs of Tex., LLC v. Amazon.com, Inc*., 838 F.3d 1266, 1269 (Fed.

25   Cir. 2016).

26       The claims plainly recite the abstract idea of transmitting, receiving, displaying and storing

27   data. Independent claims 1 and 16 recite steps to identify and transmit data (a "video stream"; an

28

"alert") at a first device, receive the data at a second device, display some of the data (the "video stream") at the second device and store some of the data (the "alert") at the first device. Ex. E, '320 Patent, 39:51-40:17. These types of activities – data transmission, display and storage – constitute "longstanding conduct that existed well before the advent of computers." *Brightedge*, 304 F. Supp. 3d at 866. That the claims recite a specific type of information" – patient data – makes them no less abstract. *Software Rights*, 485 F. Supp. 3d at 1108 (citing *Intellectual Ventures I*, 850 F.3d at 1342).

The '320 Patent also adds no new physical or technical improvement to this process. The claims describe generic computer functionality using "purely functional terms," such as "identifying" a video stream, "transmit[ting]" the video stream, "receiving" the video stream, "displaying" the video stream, "transmitting motion sensor data," "receiving" an alert, "providing" control and "logging" the alert." Receiving data at a computing device from sensors is an abstract concept (*see Content Extraction*, 776 F.3d at 1349), as is transmitting data from one computing device to another. *Crandall Techs. LLC v. Vudu, Inc.*, No. 20-cv-04849, 2021 WL 521215, at *1 (N.D. Cal. Feb. 12, 2021) (citing *Affinity Labs*, 838 F.3d at 1269). These claim terms underscore their abstract nature, as results-based language coupled with conventional technology is generally abstract. *Coop. Entm't*, 22021 WL 2531069, at *5.

The claims also fail to recite with any particularity *how* the "sitter management device" and "first sitter device" perform these functions. *Broadcom*, 2021 WL 4170784, at *6. For example, claim 1 recites a "sitter management device" that "transmit[s]" video streams but does not disclose how that device determines which video streams to send to which devices or how the device transmits the video streams. Claim 1 also recites the "sitter management device" sending an "alert" to a "sitter device" but does not disclose how the alert is generated or sent. Claim 1 further discloses allowing a "sitter device" to control the sitter management device but does not disclose how this functionality is implemented or enabled. The claims thus describe basic capabilities of the sitter management device and the sitter devices but do not disclose how these devices perform the claimed functionality. *See Coop. Entm't.,* 2021 WL 2531069, *5. Implementing the abstract concept on generic "sitter management" and "sitter" devices implemented in an "electronic sitter management system coupled

1   to a real-time patient surveillance network," and "providing at least one interactive control" does not

2   make it non-abstract. *Linquet*, 2021 WL 4198521, at *4. Nor do the claims suggest that the "at least

3   one interactive control" is anything but standard software or a known algorithm operating on a generic

4   computer.

5           The specification only confirms the abstract nature of the claims by describing the recited

6   components as well-known and generic. Ex. E, '320 Patent, 13:67-14:43; 16:55-17:45; 38:22-39:38.

7   The '320 Patent also explains that the claimed process was well-known and long-performed by

8   humans and emphasizes that the claimed method automates these human activities to alleviate the

9   expense of placing a sitter in every patient room. *Id.*, 3:30-33, 9:34-42. Like the other CareView

10  Patents, the '320 Patent is directed to automating human monitoring using generic computers and

11  other known devices. The specification describes no new tangible components and no technological

12  solution to a technological problem. *Univ. of Florida*, 916 F.3d at 1367. The generic "sitter

13  management" and "sitter" devices are mere conduits for the abstract idea of transmitting, receiving,

14  displaying and storing data. Implementing old practices in a new environment does not convert an

15  otherwise abstract idea into something patentable. *Broadcom*, 2021 WL 4170784, at *7 (citing *Simio*

16  *LLC*, 983 F.3d at 1360). The concept of forwarding a video feed from a camera to a sitter device does

17  not save the claims. Sending data from one computing device to another is another abstract activity,

18  and applying this abstract concept to sending video data from one device to another does not render

19  the '320 Patent claims any less abstract.

20          The additional limitations in system claim 16 does not make claim 16 any less abstract.

21  Nothing in the specification or claims suggests that the "video display" and "sitter interface object"

22  are anything other than conventional hardware and software components, respectively. Nor do any of

23  the dependent claims change that analysis. While these dependent claims provide additional methods

24  for transmitting and receiving video streams and alerts and assigning video streams to other sitter

25  devices, none transform the otherwise abstract process in independent claims 1 and 16 into patent-

26  eligible subject matter. *buySAFE*, 765 F.3d at 1355 ("The dependent claims narrowing of such long-

27  familiar commercial transactions does not make the idea non-abstract for section 101 purposes.").

28

DEFENDANTS' MOTION TO DISMISS
NO. 4:21-CV-07061-HSG

1

### 2. The Claims Lack an Inventive Concept

The claim elements, whether individually or as an ordered combination, do not transform the abstract idea in independent claims 1 and 16 into patent-eligible subject matter. The claims recite conventional components ordered in a conventional way for transmitting, receiving, displaying and storing data. The recited steps were known, routine and conventional in automated patient monitoring and sitter management. *See Elec. Power Grp.* 830 F.3d at 1356.

The specification also fails to indicate any particular advantages or improvements to technology that are achieved by collecting the claimed video data, distributing the claimed video data to sitter devices or receiving user-generated alerts at a computing device. Nothing in the specification suggests that the narrowing concepts of "receiv[ing] the … video stream regardless of whether an alert is received" and "providing at least one interactive control" are sufficient to transform these abstract concepts in the claims into patent-eligible subject matter.

Narrowing the claims with references to specific generic devices ("sitter management device," "sitter device" and/or "surveillance network") to perform the method does not "amount to "significantly more" than the overall ineligible concept of transmitting, receiving, displaying and storing data. *Software Rights*, 485 F. Supp. 3d at 1112. Nor does anything in the specification suggest that these steps are recited in a non-conventional order. Lastly, no dependent claim cabins the scope of the abstract methods recited in independent claims 1 and 16.

## VI. CONCLUSION

For these reasons, Defendants respectfully request the Court dismiss the SAC with prejudice for failing to state a claim upon which relief can be granted.

December 10, 2021                          Respectfully submitted,

                                           By: */s/ Evan S. Nadel*
                                           Evan S. Nadel
                                           **MINTZ LEVIN COHN FERRIS**
                                             **GLOVSKY & POPEO P.C**.
                                           44 Montgomery Street, 36th Floor
                                           San Francisco, CA  94104
                                           Tel:  415-432-6000
                                           Fax:  415-432-6001
                                           enadel@mintz.com

1

2

Brad M. Scheller (*pro hac vice*)
**MINTZ LEVIN COHN FERRIS**
 **GLOVSKY & POPEO PC**

3

4

666 Third Avenue
New York, NY 10017
Tel:  212-692-6761
Fax:  212-983-3115
bmscheller@mintz.com

5

6

7

Michael Renaud (*pro hac vice*)
**MINTZ LEVIN COHN FERRIS**
 **GLOVSKY & POPEO P.C.**

8

9

10

One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
mrenaud@mintz.com

11

12

*Attorney for Defendants*
*Interactive Digital Solutions, LLC and*
*MedSitter, LLC*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

117449685v.18