Brian A. E. Smith (SBN 188147)
bsmith@bzbm.com
Joseph J. Fraresso (SBN 289228)
jfraresso@bzbm.com
**BARTKO ZANKEL BUNZEL & MILLER**
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile:  (415) 956-1152

Seth H. Ostrow (*pro hac vice*)
sho@msf-law.com
Jeffrey P. Weingart (*pro hac vice*)
jpw@msf-law.com
Robert Phillip Feinland (*pro hac vice*)
rf@msf-law.com
**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: 212- 655-3500
Fax: 212- 655-3535

Attorneys for Plaintiff
CAREVIEW COMMUNICATIONS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| CAREVIEW COMMUNICATIONS, INC., | Case No. 4:21-CV-07061-HSG |
| Plaintiff, | **PLAINTIFF CAREVIEW COMMUNICATIONS, INC.'S OPPOSITION TO MOTION TO DISMISS FOR LACK OF PATENTABLE SUBJECT MATTER PURSUANT TO 35 U.S.C. § 101** |
| v. | |
| INTERACTIVE DIGITAL SOLUTIONS, LLC AND MEDSITTER, LLC,, | |
| Defendants. | DATE:   April 28, 2022<br>TIME:   2:00 p.m.<br>PLACE: Courtroom 2<br>JUDGE: Hon. Haywood S. Gilliam, Jr. |

1

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

I.     INTRODUCTION .................................................................................................. 1

II.    STATEMENT OF FACTS ..................................................................................... 3

III.   LEGAL STANDARDS ........................................................................................... 4

IV.   ARGUMENT .......................................................................................................... 7

     A.    The Claims Are Not Directed to Abstract Ideas ....................................... 7

          1.    The '348 Patent ............................................................... 8

          2.    The '069 Patent ............................................................. 12

          3.    The '012 Patent ............................................................. 14

          4.    The '320 Patent ............................................................. 17

          5.    The '961 Patent ............................................................. 19

     B.    The Asserted Patents Satisfy Step 2 Because
          They Contain Inventive Concepts ........................................................ 21

     C.    Questions of Fact Preclude Judgment on the Pleadings ........................ 24

V.    CONCLUSION .................................................................................................... 25

CAREVIEW'S OPPOSITION TO MOTION TO DISMISS FOR LACK OF PATENTABLE SUBJECT MATTER
PURSUANT TO 35 U.S.C. §101

# TABLE OF AUTHORITIES

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  890 F.3d 1354 (Fed. Cir. 2018) ......................................................................5

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014).............................................................................*passim*

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC*,
  967 F.3d 1285 (Fed. Cir. 2020) ......................................................................9

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ....................................................................22

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) .............................................................*passim*

*CardioNet, LLC v. InfoBionic, Inc*,
  955 F.3d 1358 (Fed. Cir. 2020) ...........................................................5, 6, 19

*Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*,
  No. 15-CV-02177-SI, 2016 WL 283478, at *2 (N.D. Cal. Jan. 25, 2016) ................4

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018) ......................................................................5

*Cronos Techs., LLC v. Expedia, Inc.*,
  No. CV 13-1538-LPS, 2015 WL 5234040, at *3 (D. Del. Sept. 8, 2015) ..................6

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ...............................................................23, 24

*Diamond v. Diehr*,
  450 U.S. 175 (1981)......................................................................................8

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) .............................................................*passim*

*Egenera, Inc. v. Cisco Systems, Inc.*,
  234 F. Supp. 3d 331 (D. Mass 2017) ...............................................................24

*Hypermedia Navigation LLC v. Facebook, Inc.*,
  No. 17-CV-05383-HSG, 2018 WL 3932434 (N.D. Cal. Aug. 16, 2018) .............4, 5, 16

*Immersion Corporation v. Fitbit, Inc.*,
  313 F.Supp.3d 1005 (N.D. Cal. 2018) ..............................................................8

*In re TLI Commc'ns LLC Patent Litig.*,
  823 F.3d 607 (Fed. Cir. 2016) ................................................................................................. 7

*InfoBionic, Inc. v. Cardionet, LLC*,
  141 S. Ct. 1266 (2021) ........................................................................................................... 6

*Mayo Collaborative Svcs. v. Prometheus Laboratories, Inc.*,
  132 S. Ct. 1289 (2012) .............................................................................................. 22, 23, 24

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) ........................................................................................ 2, 6

*Mirror Worlds Technologies, LLC v. Apple Inc.*,
  NO. 6:13–CV–419, 2015 WL 6750306, at *10 (E.D. Tex Jul. 7, 2015) ................................. 24

*Pure Data Sys., LLC v. Ubisoft, Inc.*,
  329 F. Supp. 3d 1054 (N.D. Cal. 2018) .................................................................................. 5

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
  827 F.3d 1042 (Fed. Cir. 2016) ...................................................................................... 5, 23

*Thales Visionix Inc. v. United States*,
  850 F.3d 1349 (Fed. Cir. 2017) .................................................................................... 2, 8, 24

*TMI Solutions LLC v. Bath & Body Works*,
  No. 17-965-LPS-CJB, 2018 WL 4660370, at *8 (D. Del. Sept. 28, 2018) ............................... 5

*Trading Techs. Int'l, Inc. v. CQG, Inc.*,
  675 F. App'x. 1001 (Fed. Cir. 2017) ................................................................................... 19

**Statutes**

35 U.S.C. § 101 ....................................................................................................... 1, 3, 25

Plaintiff CareView Communications, Inc. ("Plaintiff" or "CareView") files this Opposition to Defendants Interactive Digital Solutions, LLC and MedSitter, LLC's (collectively, "Defendants") Motion to Dismiss for Lack of Patentable Subject Matter Pursuant to 35 U.S.C. § 101 (D.I. 63, the "Motion") filed on December 10, 2021. As discussed below, Defendants' Motion should be denied. The claims of U.S. Patent Nos. 7,911,348 (the "'348 Patent"), 7,987,069 (the "'069 Patent"), 9,318,012 (the "'012 Patent"), 9,635,320 (the "'320 Patent"), and 10,055,961 (the "'961 Patent") (collectively, the "Asserted Patents") are directed to technical improvements in patient monitoring systems to prevent patient falls, reduce false alarms, increase in-room safety of patients, and reduce operational costs for healthcare facilities. The claims in the Asserted Patents recite various specific technological solutions that are both non-abstract and contain inventive concepts in satisfaction of the standards for patent eligibility set forth in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

> *Fall prevention is a ubiquitous challenge for healthcare organizations across the country.* (D.I. 58, Ex. L[1]).

CareView has become a leader in turnkey patient video monitoring solutions by providing innovative ways to increase patient protection and prevent fall prevention. *See* D.I. 63, ¶23. In order to make patients safer, CareView provides a solution, the CareView Patient Safety System ("CPSS"), which reduces hospital patient falls and increases in-room safety. *See id.* at ¶24. More than 150 hospitals throughout the United States have deployed the CPSS resulting in an 80% decrease in patient falls; in addition, patient sitter costs have been reduced by more than 65%. *See id.* As part of the CPSS, SitterView and the CareView Controller provide a clear picture of 40 patients at once, allowing hospital staffs to more quickly intervene and document patient risks. (*Id.* at ¶26.) Unlike the prior art, the CPSS uses machine learning to differentiate between normal patient movements and behaviors of a patient at risk. *See id.* at ¶27. This technology results in less false

---

[1] All exhibits referenced herein are derived from the Second Amended Complaint.

alarms, faster staff intervention, and a significant reduction in patient falls. *See id*. The CPSS assesses and ensures a level of quality and performance provided by a healthcare facility, as well as determining the fall risk state of a patient. *See id*. at ¶37.

The Asserted Patents claim technological improvements embodied in the CPSS that overcome technological problems related to conventional patient monitoring systems that lacked the functionality to "understand the specific movements and habits of a particular patient when bed exiting" resulting in a high level of false positives and false negatives that reduced the utility of the technology. *See* D.I. 58, ¶28, Ex. A at 2:66-3:3. Like in *Thales Visionix Inc. v. United States*, 850 F.3d 1349 (Fed. Cir. 2017), the Asserted Patents claim technical solutions that are non-conventional and non-routine to address these and other technical problems arising out of, and unique to patient monitoring systems. The technical solutions include utilizing learned approaches to predict the fall risk of future video frames more accurately (*see* Ex. E at 2:53-62) and efficiently and dynamically managing sitter monitoring systems to ensure that all patients in need of sitter services are continually monitored by a human sitter. *See* Ex. D at 9:34-42. The specific systems claimed in the Asserted Patents are exactly the type of inventions that are patent eligible. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (recognizing that claims directed to "a specific means or method that improves….technology" are patent eligible).

Defendants' cookie cutter Motion entirely ignores these technological inventive aspects of the Asserted Patents. Moreover, Defendants' Motion is premised upon numerous legal and factual errors, uses attorney argument to mask the absence of evidence, and relies upon overly generalized paraphrasing of the claims. For instance, Defendants argue that the claims of the Asserted Patents are drawn to the abstract idea of collecting, receiving, analyzing, storing, and revising data. *See, e.g.*, Mot. at 22. In addition, Defendants ignored the fact that the '320 Patent and '961 Patent were examined post-*Alice* and were issued under the new 101 standards. As in *Enfish*[2] and related cases, Defendants fail to properly account for the improvement of computer functionality and the technological nature of the solutions that improve the technology used to implement patient

---

[2] *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016).

CAREVIEW'S OPPOSITION TO MOTION TO DISMISS FOR LACK OF PATENTABLE SUBJECT MATTER
PURSUANT TO 35 U.S.C. 101

monitoring systems such as greater accuracy in predicting a patient's fall risk resulting in fewer false alarms as described in the Asserted Patents.  *See e.g.*, *Thales Visionix, Inc.*, 850 F.3d at 1345 ("There are multiple advantages of the disclosed system over the prior art….it increases the accuracy with which inertial sensors measure the tracked object on the moving frame.")

At the very least, resolution of the Section 101 inquiry is premature at this stage because there are disputed factual issues relevant to the Court's patent-eligibility analysis. *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018).  Accordingly, CareView respectfully requests the Court deny the Motion and find that the Asserted Patents claim eligible subject matter under 35 U.S.C. § 101 or, in the alternative and in view of *Berkheimer*, preclude judgment at this stage.

## II.    STATEMENT OF FACTS

As the overall age in the population has increased, fall reduction has become a major focus of healthcare facilities. Ex. E at 2:12-21.  Patient falls tend to occur due to the inability to provide continuous, direct supervision of patients. *Id*. at 2:7-14.  As a result, many healthcare facilities now seek to use automated patient monitoring systems that can "better safeguard patients and improve the quality and performance of care delivery at a facility while also reducing facility liability, enhancing caregiver productivity, and lowering operational expenses." *See* Ex. A at 2:42-46.

At the times of the inventions of the Asserted Patents, however, conventional patient monitoring systems often lacked functionality and feasibility and were thus not implemented on a wide scale basis.  *Id*. at 2:46-48.  Such patient video monitoring systems had a number of technological shortcomings and problems including:

- Inability to interpret and distinguish between safe or appropriate patient behaviors or conditions and those that are potentially dangerous or inappropriate as among different patients. *Id*. at 2:62-3:3.  The conventional systems utilized a "one size fits all" approach to detecting and interpreting patient movements and thus, these systems did not understand the specific movements and habits of a particular patient when bed exiting. *Id*.
- High incidence of false positives in cases when limits and alarm levels are too tight and false negatives when limits and alarm levels are too loose. *Id*. at 2:53-61.

• Prior art pressure sensitive fall prevention monitors alert after the patient's weight has shifted out of the bed and a fall has likely occurred. *See* Ex. C at 2:57-64. These monitors do not perceive that the patient is in the process of getting out of bed. *Id.*

• Prior video monitoring systems are only reactive, resulting in staff being alerted only after an event has occurred. *Id.* at 3:44-47.

• Some prior video monitoring systems incorrectly interpret patient movement that matched a pattern for a fall prediction (*id.* at 4:40-5:4), resulting in "false alarms," that increase the amount of work for healthcare professionals. *Id.*

• Prior video monitoring systems require skilled healthcare professionals to devote time to mundane sitter duties and often fail to provide uninterrupted monitoring during critical situations leaving critical patients unmonitored, sometimes for extended periods of time. *See* Ex. D at 2:31-57.

As described below, the claims of each Asserted Patent recite technological solutions in non-conventional manners to address some of these aforementioned problems.  The Asserted Patents' claims do not simply use computers as a tool to accomplish an ordinary task or to solve a problem existing in the pen and paper world.  Rather, the new and very specific technology claimed provides solutions to recognized technological issues that are unique to patient monitoring systems.

Defendants provide no evidence at all—either from the pleadings or elsewhere—to support their oft-repeated assertions that the claimed systems and methods are routine and conventional, that nothing in the claims is innovative or inventive, and that the specification fails to indicate any advantages or improvements to technology.  Such conclusory assertions are insufficient to satisfy the Defendants' burden of proving by clear and convincing evidence that no material issues of fact remain.  *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177-SI, 2016 WL 283478, at *2 (N.D. Cal. Jan. 25, 2016).  Ultimately, as explained below, Defendants attempt to re-write the claims to ignore their true nature, including the specific improvements they provide over conventional patient monitoring systems.  Accordingly, there is no basis to find—especially given the limited record present at this stage of the proceedings—that the asserted claims are not patent-eligible.

III.   **LEGAL STANDARDS**

This Court is well-versed with the law related to patentable subject matter.   *See*, e.g., *Hypermedia Navigation LLC v. Facebook, Inc.*, No. 17-CV-05383-HSG, 2018 WL 3932434 (N.D. Cal. Aug. 16, 2018).  As this Court is aware, then, an invention "is not rendered ineligible for patent simply because it involves an abstract concept" because, "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* (internal quotations omitted).  Further, "whether a claim element or combination is well-understood, routine, and conventional is a question of fact." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1359 (Fed. Cir. 2018).[3]  Finally, this Court is well aware that a "patent is presumed valid, and the burden of establishing invalidity of a claim rests on the party asserting invalidity by clear and convincing evidence." *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1364 (Fed. Cir. 2018)..

The Federal Circuit has repeatedly held that the step one "directed to" inquiry focuses not on "whether the claims involve a patent ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon," but rather on whether the "character [of the claims] as a whole is directed to excluded subject matter." *Id.* (emphases added) (quotation marks omitted); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).  That is, "[i]t is not enough to merely to identify a patent-ineligible concept underlying the claim; [the court] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.* ("*CellzDirect*"), 827 F.3d 1042, 1050 (Fed. Cir. 2016).  Where computer technology is involved, it is "relevant to ask whether the claims are directed to an *improvement* to computer functionality versus being directed to an abstract idea." *Enfish, LLC,* 822 F.3d at 1335 (emphasis added).

---

[3] District courts have denied motions at the Rule 12 stage because "what would have been well known to 'a skilled artisan in the relevant field' at the time the patents were issued" can be difficult to determine at the pleading stage. *Pure Data Sys., LLC v. Ubisoft, Inc.*, 329 F. Supp. 3d 1054, 1067 (N.D. Cal. 2018).  *See TMI Solutions LLC v. Bath & Body Works*, No. 17-965-LPS-CJB, 2018 WL 4660370, at *8 (D. Del. Sept. 28, 2018) (finding dismissal under Rule 12 not appropriate where "complaint adequately and plausibly alleges that the claims capture a non-routine, unconventional, and not well-understood activity, and may improve the functioning of computers").

The Federal Circuit has warned in *Enfish, CardioNet*[4], and similar cases that courts be cautious not to describe the claims "at such a high level of abstraction and untethered from the language of the claims."[5]  *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (citation and quotations omitted); *see also CardioNet, LLC*, 955 F.3d at 1358 ("Generalizing the asserted claims as being directed to collecting, analyzing, and reporting data is inconsistent with the [Federal Circuit's] instruction that courts 'be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims.").

The movant has the burden to "adequately articulate[]" that any claim it alleges is a *representative* claim "adequately represent[s]" the other claims and that the other claims do not "add one or more inventive concepts that would result in patent eligibility."  *Cronos Techs., LLC v. Expedia, Inc.*, No. CV 13-1538-LPS, 2015 WL 5234040, at *3 (D. Del. Sept. 8, 2015) ("Defendants must provide at least some meaningful analysis for each of the challenged claims."); *see Berkheimer*, 881 F.3d at 1365) ("A claim is not representative simply because it is an independent claim.").  Here, Defendants lazily designate claim 1 of each Asserted Patent as a "representative claim" of all claims of each Asserted Patent but fail to offer any analysis of why all the claims in the Asserted Patents should be treated the same as these five identified claims.  And indeed, in this case, they should not, as explained further below.

## IV.    ARGUMENT

### A.    The Claims Are Not Directed to Abstract Ideas

The claims of the Asserted Patents are directed to patent-eligible subject matter—not abstract ideas—at least because "the focus of the claims is on [a] specific improvement" to patient monitoring systems, not "on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."  *Enfish*, 822 F.3d at 1335-36.  For one, patient monitoring using video systems is not an abstract idea or concept.  Unlike abstract ideas such as mitigating settlement risk

---

[4] *CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1361 (Fed. Cir. 2020), cert. denied sub nom. *InfoBionic, Inc. v. Cardionet, LLC*, 141 S. Ct. 1266 (2021)
[5] *Enfish, LLC*, 822 F.3d at 1337.

and hedging risk in commodities trading, which can be accomplished by humans using pen and paper, patient video monitoring is technical in nature and relies upon specific components and steps of the types included in the claims.  Indeed, the industry has recognized the technical solutions and real-life advantages of such patient monitoring systems.  "The [CareView Video Monitoring] program provides the ability to improve patient outcomes by reducing falls and subsequently reducing costs."  D.I. 58, Ex. L at 30.  "Another advantage is the ability to have CNAs [(certified nursing assistants)] at the bedside assisting patients' needs contrary to stripping the units of this vital resource for a 1:1 PSA [(professional staff)] in patient rooms."  *Id*. at 51.  "The role of patient sitters in healthcare is indispensable.  They offer round-the-clock monitoring for patients that require critical care, improve a patient's safety and hospital stay, and free up medical staff to focus on clinical tasks."  D.I. 58, Ex. J at 1.  Far from claiming the ideas of "collecting, analyzing and revising data," "collecting and analyzing data and identifying a change resulting from that analysis," and "storing, collecting, analyzing, comparing and drawings conclusions about data" as Defendants assert, Mot. at 11, 14, 20, the claims are directed to particular, non-conventional, and improved patient monitoring technology.

As explained below for each of the Asserted Patents, Defendants mischaracterize the nature of the claims by ignoring critical details and providing a high-level, abstract summary of the Asserted Patents' claims.  If the claims were truly as broad as Defendants now claim, Defendants would have no basis for their claim that they are "not infringing these patents" before this litigation was commenced.  *See* D.I. 59, Ex. S.  The result is that Defendants' purported analysis is moot because it fails to address the actual claim language.  Defendants miss accurately describing the claim language by a wide margin.  Defendants also ignore the language in the Asserted Patents' specifications that detail the technological problems solved by each of the Asserted Patents.

In addition, Defendants' reliance on cases where courts have invalidated claims "that merely collect, classify, or otherwise filter data" under Section 101 is misplaced.  The Federal Circuit has only found such claims impermissibly abstract when the claim limitations fail to explain the improvement in computer technology.  *See In re TLI Commc'ns LLC Patent Litig*., 823 F.3d 607, 612 (Fed. Cir. 2016) (the court invalidated the claims as patentee failed to illustrate "a specific

7

improvement to computer functionality" or "a solution to a 'technological problem.'").  Simply incorporating an abstract idea in part of a claim that is otherwise directed to patentable subject matter does not necessarily render the entire claim ineligible.  *See Immersion Corporation v. Fitbit, Inc.*, 313 F.Supp.3d 1005, 1022 (N.D. Cal. 2018) quoting *Diamond v. Diehr*, 450 U.S. 175, 187 (1981).

The Federal Circuit applied this principle in *Thales Visionix*.  Like the claimed inventions here, the patent in *Thales Visionix* disclosed an inertial tracking system for tracking the motion of an object relative to a moving reference frame with the use of inertial sensors and mathematical equations to track the position and orientation of the object.  850 F.3d at 1345.  The Federal Circuit held that "claims directed to a new and useful technique for using sensors and mathematical equations to more efficiently track an object on a moving platform" were not abstract.  *Id*. at 1349.  The Federal Circuit stated that the "claims are directed to systems and methods that use inertial sensors in a non-conventional manner to reduce errors in measuring the relative position and orientation of a moving object on a moving reference frame."  *Id*. at 1348–49.

### 1.    The '348 Patent

The '348 Patent, issued on March 22, 2011, consists of 31 claims, four of which are independent.  D.I. 58 at ¶ 30.  The independent claims describe methods and systems for monitoring patient, staff, and visitor activities to detect and interpret individual behaviors and conditions as they pertain to the overall quality and performance by a facility in delivering health care to its patients more accurately.  *See* Ex. A at 3:13-18.  As laid out in the specification and in the independent claims, the computer system gathers real-time data, *e.g.*, locations, movements, and/or behaviors, of each patient, caregiver, and visitor through sensors and assigns such data to each individual profile.  *See* Ex. A at 3:32-36.  In addition, in-room surveillance cameras can be used to generate data stream based on the patient's movements and behaviors.  *Id*.

Defendants purport that the '348 Patent and its claims "are specifically drawn to the abstract idea of collecting, analyzing, and revising data" and "provide no new physical or technical improvement."  Mot. at 11-12.  These arguments are flawed as the '348 Patent's claims describe practical solutions to technological problems related to patient monitoring.  *See Thales Visionix, Inc.*, 850 F.3d at 1348 ("The '159 patent claims provide a method that eliminates many

"complications" inherent in previous solutions for determining position and orientation of an object on a moving platform.").   One such problem of prior patient monitoring systems solved by the '348 Patent claims were the high levels of false positives and false negatives due to the systems' inability to interpret and distinguish between safe or appropriate patient behaviors or conditions and those that are potentially dangerous or inappropriate as among different patients.   *See* Ex. A at 2:47-66. For instance, claim 1 includes specific elements that are linked to these solutions such as:

> ….the profile including at least one of a limit for detecting an event, an alarm level for use in detecting an actionable event, a care regiment for the patient….
>
> data being collected at least in part using sensors, cameras and/or computers….that detect….locations and/or movements of at least some of the patients at the facility….
>
> physical condition of at least some of the patients, and/or activities performed on and/or by at least some of the patients….
>
> the computer system refining the profiles for….the patients at the facility….in order to modify at least one of limits or alarm levels.

The claimed process is not just a computer system updating patient records as Defendants argue.   *See* Mot. at 11-12.   This characterization oversimplifies the claims, fails to capture the patent's key innovation, and ignores the claimed technical context.   As explained in claim 1, the process refines profiles of each individual patient, staff, and visitor through learning techniques so that the system more accurately identifies the occurrence of triggering events in the future.   *See* Ex. A at 4:3-11, Claim 1; *see also American Axle & Manufacturing, Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1298 (Fed. Cir. 2020) (stating that an invention may successfully incorporate ineligible subject matter where it provides "a specific and detailed series of steps….that limit[ ] the possibility of preempting the [ineligible subject matter] itself").

The process does not end there as Defendants posit.   Rather, the computer system continually refines a profile to "learn" and store an individual's common behaviors, locations, and movements. *See* Ex. A at 4:3-11; *see also id*. at claims 1, 3, 4, 6-8, 12, 15-21, 23, 24, 27, 28, and 31.   The profile includes a parameter of a patient's health and wellbeing, such as a patient's nutrition and use of a walking aid.   *Id*. at 4:12-23; *see also id*. at claims 1, 23, 24, 27, 28, and 31.   By refining the profile, the claimed invention can interpret behaviors, conditions, and events in a highly individualized manner as among different patients at a healthcare facility.   *Id*. at 4:38-45; *see also id.* at claims 1

and 6-8.  The claimed system sets appropriate alarms and limits for each individual patient based on the patient profile for specific actions such as sound of patient breathing, bed turning, and bathroom time duration.  *Id*.; *see also id.* at claims 1, 2, 4, 6-8, and 24.  The refinement of a profile is an ongoing process and constantly changes based on a patient's behavior relative to a specific risk or activity to predict the actual risk more accurately.  *Id.* at 4:62-5:2; *see also id.* at claims 1, 27, 28, and 31.  The result is a reduction in the incidence of false positives and false negatives and allows for earlier intervention into a risk sequence such as support exiting, thus decreasing the chances of an injury to a patient.  *Id.* at 5:2-4.  Figure 8 below is a flowchart of an exemplary process for refining patient profiles to reduce false results:



*FIG. 8*

Other figures illustrate other aspects of the technical solutions.  *See*, *e.g.*, Fig. 4 (exemplary method for managing a response to an actionable event in a healthcare facility;  Fig. 6 (exemplary method for determining patient care and wellness using individualized patient profiles).

The claimed system also monitors a patient resting on a bed and detects movements and

behaviors that are predictive of support exiting.  *Id*. at 5:44-58; *see also id*. at claims 1 and 9—11. Earlier detection of support exiting using a patient's profile can prevent or mitigate potential harm caused by unassisted patient support exiting.  *Id*.  The claimed computer system analyzes the movements and behaviors based on the specific patient profile to distinguish between movements that are predictive of support exiting and those that are not.  *Id*.; *see also id*. at claims 1, 9-12, 27, 28, and 31.  The system then alerts a staff member if intervention is necessary.  *Id*.; *see also id*. at claims 1 and 13-14.

Defendants' analysis further ignores the limitations and inventive concepts disclosed in the dependent claims.  Specifically, dependent claim 10 describes how the system gathers the data predictive to bed exiting from ultrasound sensors in an ultrasound detection grid detecting movements of one or more ultrasound transmitters attached to the patient.  In addition, dependent claims 15-24 identify measurables and actions that further refine a patient's profile such as level of social interaction by the patient, the level of denture use by the patient, and the levels of the patient breathing that is indicative of a medical condition.  These claimed features provide additional technological innovations beyond claim 1 and illustrate why Defendants' assertion that claim 1 is representative of all the claims is conclusory and just plain wrong.

Further, all the claims require a "processor," "system memory," and a "stationary storage apparatus" as well as "sensors" and/or "cameras."  *See, e.g.*, Ex. A at claims 1 and 27.  These components are not all generic and provide specific structure to the claims.  For instance, the devices required to gather an individual's location, movement, and behaviors include RFID devices, an RFID detection grid, ultrasound devices, an ultrasound detection grid, GPS devices, cameras, motion detectors, light beam detectors, and image analysis systems.  *See* Ex. A at 3:47-60; *see also id*. at claims 1, 4, and 27-31.

For at least these reasons, the '348 Patent's claims are not abstract.

### 2. The '069 Patent

The '069 Patent, issued on July 26, 2011, consists of 30 claims, four of which are independent.  D.I. 58 at ¶31.  The claims of the '069 Patent relate to systems and methods for monitoring patient support exiting and initiating response.  *See* Ex. B at 2:32-33.  A computer system

gathers movement information through sensors that are monitoring a patient in a rest position on a support platform such as a bed.  *See* Ex. B at 2:32-46; *see also id.* at claims 1-4, 16, 19-21, and 29.  Similar to the '348 Patent, the sensors track movement on any part of a person's body, which may or may not be visible on an in-room surveillance camera, to generate a "motion capture pattern summary."  *See* Ex. B at 2:32-46; *see also id.* at claims 1, 5-6, 16, 29, and 30.  The motion capture pattern summary is individualized for each patient so that different movements by different patients may detect different responses.  *See id.* at 2:32-46; *see also id.* at claims 1, 29, and 30.  The computer system then compares the patient's motion capture pattern summary to movement data sets and determines whether there is sufficient similarity to detect that a patient is attempting to exit the platform.  *Id.* at 2:47-55; *see also id.* at claims 1, 7-9, 23, 24, 29, and 30.  In response to a detection, the computer system initiates several remedial measures such as lowering the support platform, alerting healthcare staff, and raising bed rails.  *Id.*; *see also id.* at Fig. 11 (below).



*1100*

Accessing Patient Movement Data From Sensors That Are Monitoring A Patient Resting On A Support Platform, The Patient Movement Data Indicative Of Movement In One Or More Portions Of The Patient's Body, The Support Platform Being A Specified Height Above Floor Level — *1101*

Determining That The Accessed Patient Movement Data Is Sufficiently Similar To One Or More Movement Pattern Data Sets In A Library Of Movement Pattern Data Sets, Movement Pattern Data Sets In The Library Of Movement Pattern Data Sets Representing Movements Having Some Probability Of Indicating Platform Support Exiting — *1102*

Lowering The Height Of The Support Platform From The Specified Height To A Lower Height To Reduce The Potential Fall Distance Of The Patient In Response To Determining That The Access Patient Movement Data Is Sufficiently Similar To The One Or More Movement Pattern Data Sets In The Library Of Movement Pattern Data Sets — *1103*

**FIG. 11**

Other figures illustrate other aspects of the technical solutions.  *See*, *e.g.*, Figs. 6B and 6C (example of a motion capture pattern summary of a patient and comparison of a motion capture pattern summary against a library of movements to indicate the probability of a support platform exiting

event); Fig. 10 (example method for detecting a support exiting event.) The ability of the computer system to rapidly determine that a patient is beginning to exit the support platform and then impose these remedial measures significantly reduce and prevent patient falls.

The '069 Patent thus provides and claims technological solutions to problems in existing video monitoring systems.  For example, the '069 Patent's claims address the common problem of prior patient monitoring systems which provided a "one size fits all" approach to detecting patient's movements and behaviors, with nothing to understand the movements and habits of individual patients, leading to high levels of false alarms.  *Id*. at 2:5-19.  Specifically, claim 1 teaches a method for reducing false alarms by detecting a support platform exiting event using a computer system that includes:

> accessing movement data from sensors that are monitoring a patient resting on a support platform….indicative of movement in one or more portions of the patient's body….
> generating a motion capture pattern summary for the patient….
> comparing the motion capture pattern summary to….movement pattern data sets….being representative of movements having some probability of indicating platform support exiting….
> determining that the motion capture pattern summary is sufficiently similar to one….or more movement pattern data sets…..
> detecting that the patient is attempting to exit the support platform based on the determined similarity by:….
> the general probability factor….indicative of the probability of the detected movement corresponding to a support platform exiting event….
> accessing a behavioral weighting factor for the patient….based on prior detections of movement pattern data sets confirm as support platform exiting attempts by the patient….
> combining probability factor and the behavioral weighting factor into a patient specific probability factor and….
> determining that the patient specified probability factor satisfies a configured probability threshold indicative of a support platform exiting event.

Defendants again assert pro forma arguments that the claims of the '069 Patent are directed to the abstract idea of collecting and analyzing data and that the '069 Patent does not describe any new technological improvement.  *See* Mot. at 14-15.  Defendants clearly fail to grasp the meat and bones of the claims and the technological solutions provided by the '069 Patent.  In addition, Defendants' representative claim argument neglected considering the other claims.  For example, dependent claims 12-14 describe the system's response by lowering the support platform rapidly to

1   decrease the potential fall distance and significantly reduce the harm to the patient.

2        At the core of Defendants' argument is the idea that the claimed invention could be practiced

3   by humans without technology, which requires that Defendants improperly oversimplify the

4   inventions enough to find a human counterpart that could somehow perform the steps.  However,

5   while a human could sit in a room and observe a patient for movement, a human would not

6   reasonably be expected to collect movement data and generate motion capture pattern summaries

7   for use in later analysis of patient movement as claimed.  For at least these reasons, the claimed

8   invention is not simply an abstract idea of collecting and analyzing information.

9                    **3.    The '012 Patent**

10        The '012 Patent, issued on April 19, 2016, consists of 20 claims, two of which are

11  independent.  D.I. 58 at ¶32.  The '012 Patent's claims relate to a system, method, and software

12  program product for analyzing video frames and determining the fall risk state of a patient by

13  discriminating non-motion noise and non-dangerous motion from patient movements.  *See* Ex. C at

14  1:39-44.  The '012 Patent seeks to resolve several technological problems found in patient video

15  monitoring such as not recognizing that the patient is in the process of getting out of bed until after

16  the patient's weight is out of bed, which is often too late to stop a fall from occurring.  *See id.* at

17  2:57-67.  As explained further above, the existing monitoring systems were reactive, alerting the

18  staff only ***after*** an event happened, at which point the damage is done.  *See id.* at 3:44-47.  Existing

19  systems also suffered from false alarms attributed to spurious noise in the system.  *See id.* at 4:60-

20  5:4.

21        The claims of the '012 Patent provide technological solutions to these problems through

22  specific methods, systems, and software products to predict patient falls from noise corrected

23  surveillance videos by identifying patient fall risk states.  *See id.* at 5:8-11.  For example, claim 1

24  recites a process:

25                 for predicting a risk of a patient fall based on a plurality of fall risk states….
                   at least one of the fall risk states being associated with an action….
26                 [a] surveillance camera captures a sequence of videos frames….
                   wherein a patient is present in the surveillance area, each of the plurality of
27                 video frames comprising a plurality of predetermined areas….
                   detecting  a  change  in  at  least  one  of  the  plurality  of  predetermined

28

areas….evaluating the change detected….for noise….

identifying a fall risk transition to a fall risk state selected from the hierarchy of discrete fall risk states….including a wait state, a no-wait state, and at least one other state….

wherein the identification of a fall risk transition is based upon the change detected in the at least one of the plurality of predetermined areas of the current video frame.

Predetermined areas include portions of a patient's body or danger areas in a patient's room. *See id*. at 5:29-33.  By subdividing the patient's image into discrete parts, fall state transition rules are created and assigned to each body part.  *See id*. at 5:33-36; *see also id.* at claims 1, 3, and 13.  Thus, changes detected in an area of the video frame containing a specific patient area are utilized to more accurately assess whether the movement is high risk and more likely to result in a possible fall causing a response by healthcare professionals.  *Id*. at 5:29-46; *see also id.* at claims 1, 2, 11, and 12.  By accurately defining fall state transition rules and reducing the impact of noise to these rules, the number of false alarms prevalent in the prior systems are greatly reduced.  *Id*. at 5:62-66.

Further, the '012 Patent describes and teaches noise reduction techniques to prevent false alarms.  One such technique to overcome the noise problem as described in dependent claim 10 is "identifying what appears to be new movement within a video frame….and then excluding the first video frame with new movement from fall risk state process….If the changes are detected within the frame are a result of movement and not noise, the changes will be present on successive video frames." *Id*. at 6:20-45.  By using this innovative noise reduction technique, the issuance of a patient fall alert is only delayed 0.042 seconds.  *Id*.  The table below from the '012 Patent's specification is an exemplary scenario for newly detected active events that include noise and the actions taken.

TABLE I

| Detection | Interpretation of event | New Action |
|---|---|---|
| No Change | No motion in the patient's room | None, continue in lowest fall risk state, e.g., REST |
| Raw changes anywhere in the room | If initial change between frames, treat as noise | None, continue in current fall risk state |
| Noise filtered changes anywhere in the room | Motion | Archive frame, evaluate event to determine proper fall risk state |
| Noise filtered changes corresponding to an area outside the patient's body area | Motion, probably another person in patient's room | Archive frame, without elevating the current fall risk state |
| Noise filtered changes corresponding to an area outside but very close to the patient's body area | Motion, probably another person in patient's room attending to the patient | Archive frame, elevate fall risk state to a low intermediate risk state that precludes elevating to a high fall risk state without detecting additional patient movements for a predetermined time, e.g., WAIT, and set time period |
| Noise filtered changes corresponding to the patient's body area | Patient movement (General interpretation) | Archive frame, and, generally, update the fall risk state and set a time period associated with the updated fall risk state |
| Noise filtered changes corresponding to the patient's body area | Any patient movement with another person in room and very close to the patient's body (currently in the WAIT state) | Archive frame, and depending on where the event occurs, either lower the fall risk state, e.g., NO WAIT, and set a time period for a new WAIT fall risk state, or continue WAIT state for time period without elevating fall risk state until the expiration of the WAIT time period |
| Noise filtered changes corresponding to the patent's body area | Initial patient movement that is not a direct precursor to a fall without other motion detected in room (in REST state) | Archive frame, and elevate patient fall risk state to a low intermediate fall risk state, e.g., NO WAIT, and set the time period associated with the new fall risk state |

The technical solutions provided by the '012 Patent are further detailed in the figures.  *See, e.g.*, Fig. 12 (a detailed state processing method for predicting patient falls in accordance with an exemplary embodiment of the present invention).  As explained above, the '012 Patent claims do not simply collect and analyze data, as Defendants improperly assert, Mot. at 17-18, but rather evaluate movements of a patient using sequences of video frames of predetermined areas and subdividing the patient's image into discrete parts to create fall state transition rules and to accurately determine whether a patient is in a critical fall risk state that requires an alert and immediate assistance.[6]  In view of the foregoing, the claims are clearly non-abstract.  *See Hypermedia Navigation LLC v. Facebook, Inc.*, No. 17-CV-05383-HSG, 2018 WL 3932434 (N.D. Cal. Aug. 16, 2018); *see also Berkheimer*, 776 F.3d at 1369; *Enfish*, 822 F.3d at 1335.

### 4.    The '320 Patent

The '320 Patent, issued on April 25, 2017, consists of 30 claims, two of which are independent.  D.I. 58 at ¶33.  The PTO Examiner did not issue a rejection under *Alice* or Section

---

[6] As before, this dependent claim undermines Defendants' assertion that claim 1 of the '012 Patent is a "representative claim."  Moreover, independent claim 11 discloses a system that implements the method of claim 1 that includes a surveillance video camera and process operative to capture and detect changes in the video frames of a surveillance area.

101 throughout the prosecution of the '320 Patent and instead concluded its claims satisfied the patentable subject matter standards under Section 101. The '320 Patent is directed to an unconventional sitter management system that includes at least one sitter management device and a plurality of sitter monitoring devices that capture surveillance video of a patient and their room using a plurality of video cameras. *See id*. at 3:37-55; *see also id*. at claims 1 and 16. For instance, claim 1 describes a solution for continuous patient monitoring through a process for:

> managing an electronic sitter system for monitoring patients….
>
> comprising a plurality of sitter devices, a sitter management device for managing access to at least one real-time patient surveillance video stream associated with a patient room, and a plurality of cameras located in patient rooms for capturing and transmitting surveillance video streams to the sitter management device comprising….
>
> the sitter management device identifying….[and] transmit[ting] [a real-time patient surveillance video stream] to a first sitter device….that receiv[es] [and]….display[s] the first real-time patient surveillance video stream;….
>
> transmitting motion sensor data from the first patient room to the sitter management device….
>
> receiving the alert at the first sitter device from the sitter management device, wherein the alert is triggered by motion in a patient room…..
>
> providing at least one interactive control for responding to the received alert….
>
> [and] allow the sitter device to control the operation of the sitter management device or enable communication between the sitter device and the patient room….

The sitter management device assigns each of the patient surveillance videos to display on a sitter monitoring device. *See id*. at 3:37-55; *see also id.* at claims 1-6 and 16-21. By utilizing the sitter management device, the connection process is significantly streamlined in that a camera is only required to transmit surveillance data to one location (the sitter management device) versus transmitting separate, duplicative streams to each connected device. *Id*. When the sitter is interacting with a single patient, the unmonitored patient room surveillance video is rolled over by sitter management device to other sitter monitoring devices that can receive video. *Id*. The '320 Patent employs various rollover techniques that determine where the surveillance video is reassigned. *Id*. at 3:63-4:15; *see also id.* at claims 1-6 and 16-21. For example, the GPS rollover is where the unmonitored patient room surveillance videos are reassigned to other sitters based on proximity using the device's GPS. *Id*. at 3:63-4:15; *see also id.* at claims 6 and 21. Figure 8B is a flowchart that shows an exemplary sitter rollover assignment policy.





Several of the other figures further illustrate the technical solutions provided by the '320 Patent. *See*, *e.g.*, Fig. 9A (illustrates exemplary process directed to establishing a sitter rollover assignment policy and invoking those rollover policies); Fig. 10A-B (illustrates exemplary method performed by the electronic patient sitter management system for logging events and issuing alerts and rollover policy).

In addition, to resolve the issue of sitter attentiveness, the sitter monitor devices receive alertness tests. *Id*. at 4:16-28; *see also id.* at claims 1, 7-9, 16, and 22-24. If the sitter does not respond promptly to the test, then the sitter management device takes action to protect the patient. *Id*. at 4:16-28; *see also id.* at claims 1-2 and 16-17. These actions may include sending a reminder to the sitter or determining that the sitter monitor device is unavailable and thus, implementing a rollover policy. *Id.* at claims 1-6 and 16-21. Further, as discussed above, the dependent claims describe additional limitations. For example, dependent claim 2 explains what occurs if the sitter is unavailable and a rollover method is implemented. Each of dependent claims 3-6 describe various rollover methods. Dependent claims 10-11 describe the sitter device as a wireless or a wired computing device.

"Abstraction is avoided or overcome when a proposed new application or computer-implemented function is not simply the generalized use of a computer as a tool to conduct a known or obvious process, but instead is an improvement to the capability of the system as a whole." *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x. 1001, 1005 (Fed. Cir. 2017) (citing *Enfish*, 822 F.3d at 1339).   The '320 Patent implements an improved sitter management system for managing a plurality of sitter patient monitoring devices that monitor real-time surveillance patient room videos and solve several technological problems in the industry.  *See* Ex. D at 1:21-29.  Prior sitter systems were expensive for healthcare facilities to implement as one or more professionals were devoted to the mundane task of sitter duties.  *See id*.  Even the costs of having a sitter service using unskilled personnel were astronomical.  *See id*. at 3:29-30.  The prior sitter systems also required uninterrupted monitoring of patients, which was impractical as the sitting professionals often left the sitting station in critical situations leaving the other patients unmonitored.  *See id.* at 2:31-57.   Another concern obviated here was a sitter becoming complacent and attempting to multitask at the expense of the monitored patients.  *Id*.  Thus, the '320 Patent's innovative system improves the capability of sitter management systems[7] and resolves the technological problem of prior systems by employing uninterrupted patient monitoring.

Defendants repeat the same basic arguments, mainly that the '320 Patent's claims recite the "abstract idea of transmitting, receiving, displaying, and storing data" and the '320 Patent adds no physical or technical improvements.  *See* Mot. at 22. In sum, the claimed inventions of the '320 Patent provides technological solutions to resolve technological problems in the field of patient monitoring using sitter management systems.

### 5.     The '961 Patent

The '961 Patent, issued on August 21, 2018, consists of 20 claims, two of which are independent.  D.I. 58 at ¶34.  Like the '320 Patent, the PTO Examiner did not issue a rejection under

---

[7] *See CardioNet, LLC*, 955 F.3d at 1370 (The asserted claims were "directed to a specific technological improvement—an improved medical device that achieves speedier, more accurate, and clinically significant detection of two specific medical conditions out of a host of possible heart conditions.")

1    *Alice* or Section 101 throughout the prosecution of the '961 Patent and instead concluded its claims

2    satisfied the patentable subject matter standards under Section 101.  The claimed invention is a

3    surveillance system, method, and software program product for analyzing videos frames of a patient

4    and determining from motion within the frame if the patient is at a fall risk.  *See* Ex. E at 2:7-11;

5    *see also id*. at claims 1 and 11.  The claimed invention incorporates technical components such as

6    surveillance cameras that generate a plurality of video frames and a computer system comprised of

7    memory and logic circuitry configured to store motion feature patterns extracted from video

8    recordings.  *See id*. at 3:11-27; *see also id*. at claims 1 and 11.  Independent claim 1 describes a

9    surveillance system for detecting a fall risk condition that comprises a surveillance camera to

10   generate a plurality of frames that shows a high fall risk area, a computer system that includes

11   memory and logic circuitry, which (i) stores motion feature patterns associated with real and false

12   alarm cases, (ii) receives a fall alert, (iii) determines motion features of one or more frames, (iv)

13   compare the motion features to the frames with the motion feature patterns, and (v) determine

14   whether to confirm the fall alert based on the comparison.  Independent claim 11 describes the

15   method that is implemented by the system in claim 1.  The dependent claims provide additional

16   limitations overlooked by the Defendants.  For example, dependent claim 3 describes the computer

17   system that is configured to determine statistically significant similarities between motion features

18   of the fall alert and the stored motion feature patterns.

19        The asserted claims of the '961 Patent are directed to patent-eligible subject matter—not

20   abstract ideas—because "the focus of the claims is on [a] specific improvement" to improving

21   patient monitoring in order to significantly reduce a patient fall, not "on a process that qualifies as

22   an 'abstract idea' for which computers are invoked merely as a tool."  *Enfish*, 822 F.3d at 1335-36.

23   The claimed method and system solve the technical problem of false alarms that is rampant in prior

24   monitoring systems.  *See* Ex. E at 2:41-52.  False alarms can burden a staff of healthcare

25   professionals with unnecessary interventions and result in a waste of time and resources.  *See id*.

26   The claims of the '961 Patent teach improvements to prior monitoring systems that provide for

27   greater accuracy to reduce the number of false positives detected.  *See id*.  Specifically, claim 1

28   teaches a surveillance system for resolving these problems where:

a surveillance camera….generate[s] a plurality of frames showing an area in which a patient at risk of falling is being monitored and….

a computer system comprising memory and logic circuitry to:….

store motion feature patterns….representative of motion associated with real alarm cases and false alarm cases of fall events….

receive a fall alert….associated with the plurality of frames generated….

determine motion features….from the plurality of frames that correspond to the fall alert….

compare the motion features….with the motion feature patterns; and….

determine whether to confirm the fall alert based on the comparison.

Figure 8 below further illustrates the exemplary use of motion feature patterns in the video.



FIG. 8

These improvements are patentable because they improve the technology itself.  For example, one such technical solution is "employing supervised learning techniques to improve the accuracy of fall detection given a plurality of video frames."  *See id.* at 2:52-57.  Other advantages of the embodiments of the invention include "the use of multiple image frames that corrects training data to remove noise appearing due to changes in lighting."  *See id.* at 3:1-7.

In other embodiments of the claimed invention, motion features in one or more video frames can be determined by detecting motion of pixels by comparing pixels of current frames with at least one previous frame and marking pixels that have changed.  *Id.* at 4:22-26; *see also id.* at claims 4

and 14.  Ultimately, these embodiments solve the longstanding technological problem of false alarms by providing substantially greater accuracy in predicting a fall risk in patients.

Defendants purport that the claims are "drawn to the abstract idea of storing, collecting, analyzing, comparing and drawings conclusions about data," that the patent "describes no new physical or technical improvement," and that the specification describes "the components as well-known and generic."  Mot. at 20-21.  It is obvious that Defendants copied and pasted the same 101 arguments throughout the Motion.  However, Defendants are simply mistaken. In view of the foregoing, there is ***nothing*** abstract about the asserted claims in the '961 Patent.

**B.     The Asserted Patents Satisfy Step 2 Because They Contain Inventive Concepts**

Because the asserted claims pass step one of the *Mayo* inquiry, an analysis under *Mayo*'s second step is not necessary.  But even assuming any of the claims of the Asserted Patents are found to be directed to an abstract idea, the claims recite an "inventive concept" that provides "significantly more" than the abstract idea and transform this idea into a patent-eligible application. *Alice*, 134 S. Ct. at 2357-58.

As the Federal Circuit explained in *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, an inventive concept "may arise in one or more of the individual claim limitations or in the ordered combination of the limitations."  827 F.3d 1341, 1349 (Fed. Cir. 2016).  Here, the claims of each Asserted Patent demonstrate an inventive concept under both tests as follows:

- '348 Patent: the combination of a patient profile that is continuously undergoing refinement due to a patient's behavior, movement, and locations using certain parameters captured in real-time by various such as RFID devices, ultrasound devices, sensors, cameras, motion detectors, etc. and which said refined profile sets appropriate alarms and limits for each individual patient in order to better predict an individual's behavior and fall risk, thus significantly reducing false alarms;

- '069 Patent: the combination of using sensors to monitor patients resting on a support platform and determining whether the collection of movements by these patients (the motion capture pattern summary) has enough similarities of movements that indicate a high risk fall state in order to initiate remedial measures such as lowering the support platform and alerting healthcare staff to prevent injury to the patient.  Identifying the

movements that correlate to a high risk fall state leads to a reduction in false alarms;

- '012 Patent: the combination of a surveillance camera that captures sequences of video frames of predetermined areas of a patient's body or room, assigning fall state transitions rules to these areas in which movements are detected, reducing any noise that would lead to false alarms, and determining whether the movement was high risk and in turn causing a response by healthcare staff;

- '320 Patent: the combination of a sitter management device that displays a plurality of patient surveillance videos and in which any video may be rolled over through various rollover techniques to another sitter management device if the sitter does not timely respond to an alert to ensure continuous, uninterrupted patient monitoring; and

- '961 Patent: the combination of surveillance cameras that generate a plurality of video frames and a computer system that stores motion feature patterns extracted from video frames of real and false alarms cases in order to confirm whether a patient's motion correlates to a motion feature pattern for a real alarm or a false alarm in a comparison of the motion with the motion feature patterns with the purpose of providing superior accuracy for a patient's fall risk and reducing false alarms that result in unnecessary interventions, which waste valuable time and resources.

Thus, the claims of the Asserted Patents are more than a collection of "conventional steps, specified at a high level of generality." *Mayo Collaborative Svcs. v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1300 (2012).

The asserted claims, moreover, cover an inventive concept under the Federal Circuit's holdings in *DDR Holdings* and *CellzDirect* because they "improve[] an existing technological process." *CellzDirect*, 827 F.3d at 1050 ("Under step two, claims that are 'directed to' a patent-ineligible concept, yet also 'improve[] an existing technological process,' are sufficient to 'transform[] the process into an inventive application' of the patent-ineligible concept."). As explained, the asserted claims resolve problems particular to patient monitoring systems, for example, by addressing issues with false alarms by accurately identifying when a patient is in a critical fall state that requires intervention and with sitter management systems to prevent unmonitored patients. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59 (Fed. Cir. 2014) (holding that claims "amount[ing] to an inventive concept for resolving [a] particular

1   Internet-centric problem" were patent-eligible).  And like the claims found patent-eligible in *DDR*

2   *Holdings*, the "claimed solution is necessarily rooted in computer technology in order to overcome

3   a problem specifically arising in the realm of computer networks."  *Id*. at 1257.

4          Given the unconventionality of the claim limitations—both individually and as a whole—

5   and the fact that the claims describe a specific improvement to a concrete technology, the asserted

6   claims of each Asserted Patent are patent-eligible under step two of the *Mayo* inquiry.  Where, as is

7   the case here, claims "are directed to systems that improve computer functionality, they claim

8   patent-eligible subject matter." *Egenera, Inc. v. Cisco Systems, Inc.*, 234 F. Supp. 3d 331, 344–45

9   (D. Mass 2017).   At a minimum, it is entirely premature to conclude that the asserted claims are

10  conventional on the limited factual record at this stage of the proceedings.  *See, e.g., Mirror Worlds*

11  *Technologies, LLC v. Apple Inc.*, NO. 6:13–CV–419, 2015 WL 6750306, at *10 (E.D. Tex Jul. 7,

12  2015) ("However, the Court cannot conclude at the pleading stage that claim 13 uses conventional

13  and generic computer functions to disproportionately preempt the abstract idea.").  Thus, CareView

14  sufficiently demonstrated that the Asserted Patents claim a technological solution applied in the real

15  world to solve a technological problem and are patent eligible.  *See, e.g., Thales Visionix, Inc.*, 850

16  F.3d at 1349 (The Court found that the claims at issue were not directed to abstract ideas as they

17  "specify a particular configuration of inertial sensors and a particular method of using the raw data

18  from the sensors in order to more accurately calculate the position and orientation of an object on a

19  moving platform.").

20         **C.     Questions of Fact Preclude Judgment on the Pleadings**

21         Defendants' Motion offers attorney argument without citing any evidence in support.

22  Defendants' mere attorney arguments—insufficient to satisfy the clear and convincing evidence

23  standard in their own right—serve only to highlight the factual disputes that exist relating to the

24  Asserted Patents. *Berkheimer*, 881 F.3d at 1367-68.

25         Here, Defendants failed to meet this heavy burden to properly invalidate the Asserted Patents

26  at this early stage.  Defendants provide no evidentiary support for their allegations that the

27  limitations recited by the claims are routine and conventional or that humans could practice the

28  claimed inventions without the use of a computer, notwithstanding the technical components

1   required to practice the claimed inventions.  CareView disputes Defendants' arguments and these

2   questions are questions of fact for further down the road.

3       Moreover, CareView pled sufficient facts to show a genuine issue of fact regarding Step

4   Two of the *Alice* test.  Defendants even recognized that the combination of elements clamed in the

5   Asserted Patents amount to significantly more than just an abstract idea and provide solutions in the

6   industry.   The following is an excerpt from an article in *HealthTech Magazines* discussing the

7   MedSitter system with Mr. Mills, Founder and President of Defendants:

8       While consulting with multiple IDSolutions' telehealth customers, he learned that
        skilled healthcare employees were often placed into patient rooms to monitor patients
9       who were antagonistic, distressed, at risk of falling. They provide one-on-one care in
        a manner that soothes patients, observes changes in their condition, and summon
10      nursing staff when necessary. Identifying this as a trending need, he realized that
        there had to be a better way to do this….As opposed to the traditional patient
11      observation method, [MedSitter] is not only more convenient for patient sitters but
        also more cost-effective for hospitals. The solution gives users access to two-way
12      audio and two-way video as well as far-end camera controls. It is also powered by
        proprietary visual intelligence, facial detection, and real-time motion detection that
13      quickly alert an observer of any movement or expression of distress. MedSitter can
        be used to verbally redirect a patient, while simultaneously contacting the right staff
14      for clinical intervention.

15

16  *See* Ex. J at p. 2-3.  In addition, the claims in the Asserted Patents overcome existing problems in

17  the patient monitoring industry, *e.g.*, frequency of false alarms and greater accuracy in predicting a

18  patient's fall risk.  *See* Ex. F at p. 9 ("Conventional sensors can only detect certain behaviors, so

19  these sensors cannot set the [risk] levels [of falling]. Therefore, it is unclear whether the risk of the

20  patient falling will increase after detection [of a patient's movement by] these sensors. As a result,

21  there are many false [alarms].").

22      Thus, in the event the Court is not prepared to deny the Motion outright, in the alternative

23  the Court should defer ruling on the Motion in view of these factual disputes.

24  **V.    CONCLUSION**

25      For the foregoing reasons, CareView respectfully requests that the Court deny Defendants'

26  motion to dismiss and issue a finding that the claims of the Asserted Patents are directed to patent

27  eligible subject matter under 35 U.S.C. § 101.  In the alternative, the Court should preclude judgment

28  at this stage in view of the questions of fact underlying the patent eligibility determination.

1    DATED:  January 21, 2022                Respectfully submitted,

2

3                                            By:      */s/ Joseph J. Fraresso*
                                                 Brian A. E. Smith (SBN 188147)
4                                                bsmith@bzbm.com
                                                 Joseph J. Fraresso (SBN 289228)
5                                                jfraresso@bzbm.com
                                                 **BARTKO ZANKEL BUNZEL & MILLER**
6                                                A Professional Law Corporation
                                                 One Embarcadero Center, Suite 800
7                                                San Francisco, California 94111
                                                 Telephone: (415) 956-1900
8                                                Facsimile:  (415) 956-1152

9                                                Seth H. Ostrow (*pro hac vice*)
                                                 sho@msf-law.com
10                                               Jeffrey P. Weingart (*pro hac vice*)
                                                 jpw@msf-law.com
11                                               Robert Phillip Feinland (*pro hac vice*)
                                                 rf@msf-law.com
12                                               **MEISTER SEELIG & FEIN LLP**
                                                 125 Park Avenue, 7th Floor
13                                               New York, NY 10017
                                                 Tel: 212- 655-3500
14                                               Fax: 212- 655-3535

15                                               Attorneys for Plaintiff
                                                 CAREVIEW COMMUNICATIONS, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28